JUDGE SCHOFIELD

23 CV 02250

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNIVERSAL ENTERTAINMENT
CORPORATION, UE RESORTS
INTERNATIONAL, INC. f/k/a OKADA MANILA
INTERNATIONAL, INC. and TIGER RESORT,
LEISURE AND ENTERTAINMENT, INC.

                         Plaintiffs,

            v.

ALEXANDER EISEMAN, ZAMA CAPITAL
ADVISORS LP, ZAMA CAPITAL STRATEGY
ADVISORS LLC, JOHN DOE ENTITY 1, and
CHRISTIAN LITTLEJOHN

                         Defendants.

No.: _____

**COMPLAINT**

---

Plaintiffs Universal Entertainment Corporation ("UEC"), UE Resorts International, Inc.,

formerly known as Okada Manila International, Inc. (the "New Parent"), and Tiger Resort, Leisure

and Entertainment, Inc. ("TRLEI" or the "Operating Company" and together with UEC and the

New Parent, "Plaintiffs"), by and through their undersigned counsel, bring this action against

Defendants Zama Capital Advisors LP ("Zama LP"), Zama Capital Strategy Advisors LLC

("Zama LLC") and, John Doe Entity 1 (with Zama LP and Zama LLC, the "Zama Defendants"),

and Alexander H. Eiseman and Christian Littlejohn, individuals, for violations of U.S. securities

laws, breach of Defendants' fiduciary and contractual obligations, and other wrongful conduct,

and allege as follows:

## NATURE OF THE ACTION

1.      UEC is a Japanese corporation that operates in various lines of business, including

in the gaming industry. UEC's most valuable asset is the Okada Manila Resort & Casino (the

"Resort"), a casino located in Manila, Philippines.  The Resort is owned and operated by TRLEI, a Philippine corporation referred to for simplicity as the Operating Company.

2.       In 2020, Alexander Eiseman, the Managing Partner of the Zama Defendants, pitched UEC on the idea of doing a transaction with a special purpose acquisition company ("SPAC").[1]  The SPAC concept was enticing to UEC because it would afford it access to capital markets through a partial listing on the Nasdaq.  Eiseman and one or more of the Zama Defendants acted as a broker for the transaction, setting up meetings with potential investors and counterparties, and generally encouraging and supporting the transaction.  Indeed, Eiseman went so far as to claim that the Zama Defendants had engaged major investment banks to help pursue the transaction.  Eiseman, on behalf of Defendant Zama LP, then signed an engagement letter, confirming their work as a broker.

3.       Neither Eiseman nor Zama LP, however, are registered with the U.S. Securities and Exchange Commission (the "SEC") as a broker, in contravention of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78o.  And what followed demonstrates the bad things that can happen when the protections provided by the U.S. securities laws are ignored so that individuals can benefit themselves at the expense of others.

4.       Indeed, as described more fully below, it now appears that Eiseman and one or more of the Zama Defendants, while purporting to act on behalf of UEC in connection with the SPAC transaction, *are actually on both sides of the deal*.  Upon information and belief based on recently learned facts that are described below, Eiseman and Zama struck a secret deal with the

---

[1] SPACs are used as an alternative to an initial public offering, the traditional route for a company to go public.  In the SPAC process, an acquisition vehicle is created and raises proceeds through an initial public offering.  Those proceeds are then used to purchase and merge with a private acquisition target, thereby taking that company public.

counterparty to the SPAC transaction through which Eiseman and/or Zama actually hold an economic interest in their principal's counterparty; an interest that would be worth millions of dollars if the SPAC transaction closes, but will be worthless if it does not. That clear conflict was never disclosed to UEC or any of the Plaintiffs. But it has led Eiseman and the other Defendants to prioritize their own interests above those of UEC and the other Plaintiffs, to whom the Defendants owe fiduciary and contractual duties, all in the interest of getting a deal done. Indeed, Defendants went to extraordinary lengths to get a deal done, even demanding that UEC file materially misleading offering materials that omitted to disclose to potential investors that the Resort had been violently taken over by UEC's controversial founder, Kazuo Okada, and had been out of the Operating Company's control for weeks, among others.

5.      Through this action, Plaintiffs seek to void the unlawful engagement letters between UEC and the Zama Defendants, each of which violates U.S. securities laws, and seek to recover damages for the significant harms that the Defendants have caused.

## THE PARTIES AND RELEVANT NON-PARTIES

**A.      The Plaintiffs**

**1.      Universal Entertainment Corporation**

6.      UEC is a publicly-listed Japanese corporation with a principal place of business in Tokyo, Japan. UEC has decades of experience in the gaming industry.

7.      UEC has a number of subsidiaries and related entities, discussed further below, which are relevant to this action. They include Tiger Resort Asia Ltd. ("TRA"), the Operating Company, UE Resorts International, Inc., formerly known as Okada Manila International, Inc. (the "New Parent"), and Project Tiger Merger Sub, Inc. ("Merger Sub").

### 2.   New Parent

8.      New Parent is a Philippines corporation with a principal place of business in Parañaque City, Metro Manila, Philippines.  New Parent is a party to the Merger Agreement (described below) under its prior name, Okada Manila International, Inc., which it changed on December 8, 2021.

### 3.   The Operating Company

9.      The Operating Company is a Philippines corporation with its principal place of business at the premises of Okada Manila in Parañaque City, Metro Manila, Philippines.

10.     UEC controls the Operating Company though TRA, which is a Hong Kong private limited company with a principal place of business in Hong Kong.  TRA is a wholly-owned subsidiary of UEC.  TRA owns 99.9% of the voting shares of the Operating Company.

### B.   The Defendants

### 1.   Zama LP

11.     Defendant Zama LP is a Delaware limited partnership with its principal place of business at 900 Third Avenue, Suite 201, New York, NY 10022.

### 2.   Zama LLC

12.     Defendant Zama Capital Strategy Advisors LLC purports to be a Delaware Limited Liability Company with its principal place of business in New York, New York.  Records available on the website of the New York Department of State list Zama Capital Strategy Advisors LLC as being formed in Delaware on October 19, 2021.

### 3.   John Doe Entity 1

13.     John Doe Entity 1 is an entity under the control of Eiseman that has unjustly received funds from UEC and/or is the actual entity identified in agreements as Zama LLC.

### 4. Alexander H. Eiseman

14.    Defendant Alexander H. Eiseman, an individual, is the Managing Partner of Zama LP and Zama LLC.  Upon information and belief, Eiseman resides in New York, New York.

### 5. Christian Littlejohn

15.    Defendant Christian Littlejohn, an individual, is associated with and working for Zama LP.  Upon information and belief, Littlejohn resides in New York, New York.

### C.    Relevant Non-Parties

### 1.    Other UEC Entities

16.    Merger Sub is a Delaware corporation formed solely for the purpose of effecting the Business Combination and has not carried on any activity other than those in connection with the Business Combination.  Merger Sub is a direct wholly-owned subsidiary of New Parent.

17.    UEC, TRA, Operating Company, New Parent, and Merger Sub are collectively referred to herein as the "UEC Parties."

### 2.    26 Capital and Jason Ader

18.    26 Capital Acquisition Corp. ("26 Capital") is a Delaware corporation with its principal place of business in Miami, Florida.  26 Capital is a Nasdaq-listed SPAC formed for the purposes of effecting a merger.

19.    26 Capital was formed by an individual, Jason Ader, through his limited liability company, SpringOwl Asset Management LLC.

20.    26 Capital Holdings LLC ("26 Capital Holdings") is the financial "sponsor" of 26 Capital, and it owns nearly 7 million shares of 26 Capital's Class B shares.

### 3.    Kazuo Okada

21.    Kazuo Okada is the founder of the Parent Company and former Chairman and CEO of the Operating Company.

22.     Okada was ousted from the Parent Company in 2017 for embezzling Parent Company funds.

23.     Since his ouster, and as detailed in part below, Okada has pursued a variety of legal and extra-legal avenues to attempt to regain control of the Parent Company and the Operating Company.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, Section 214 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), 15 U.S.C. § 80b–14, and 28 U.S.C. § 1331, as Plaintiffs allege violations of the Exchange Act, 15 U.S.C. § 78o and the Investment Advisers Act, 15 U.S.C. § 80b–3. This Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

25.     The Zama Defendants are subject to personal jurisdiction in New York, because, on information and belief, the principal place of business of each is in New York, and because each of the Zama Defendants consented to jurisdiction in New York pursuant to, for Zama LP, the First Engagement Letter (defined herein), and for Zama LLC, the Second Engagement Letter (defined herein). Eiseman and Littlejohn are subject to personal jurisdiction because each is a citizen and domiciliary of New York.

26.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) on the following grounds: (i) pursuant to the First Engagement and Second Engagement Letters, the Zama Defendants agreed to "submit to the exclusive jurisdiction of the federal or state courts located in the County of New York, State of New York in any proceeding arising out of or relating to" the respective engagement letter; (ii) on information and belief, a substantial part of

the events or omissions giving rise to Plaintiffs' claims occurred in the County of New York, and; (iii) on information and belief, the principal place of business for the Zama Defendants, Eiseman, and Littlejohn is in the County of New York, and upon information and belief, Eiseman and Littlejohn are residents of the County of New York.

## FACTUAL ALLEGATIONS

A.   **Zama Acts as UEC's Representative and Agent in Seeking a SPAC Counterparty**

27.     In or around July 2020, Eiseman recommended to Toji Takeuchi, a disgruntled and disloyal employee of UEC who served as a director of both the New Parent and the Operating Company (the "Disloyal Director"), that UEC engage in a transaction with a U.S.-listed SPAC, through which UEC would sell an interest in the Resort to the investing public.  Eiseman had already been busy brokering such a deal, setting up at least one meeting with a potential SPAC called Leisure Acquisition Corp.

28.     UEC's Japanese leadership had limited experience with U.S. regulatory requirements and no experience with SPACs, and so began to rely on Eiseman and Zama, placing their trust and confidence in them to find such a deal.  In February 2021, UEC and Zama LP executed an engagement letter (the "First Engagement Letter") through which Zama LP agreed to assist UEC in evaluating potential counterparties to a transaction with UEC, including SPACs.  A copy of the First Engagement Letter is attached hereto as Exhibit A.

29.     The First Engagement Letter made Zama LP exclusively responsible for identifying a SPAC transaction for UEC, and prohibited UEC and its subsidiaries from soliciting, commencing, or negotiating any SPAC transaction without the involvement of Zama LP.

30.     The First Engagement Letter included a confidentiality provision that required, among other things, that Zama LP "keep information about [UEC] that is received from [UEC]

after the date of this Agreement in confidence" and to "not disclose such information to other parties except to SPACs who have signed a confidentiality agreement or obligation with Zama . . . ."

31.     Zama was not entitled to any compensation under the First Engagement Letter. But Eiseman expressed to management of UEC and the Operating Company on multiple occasions that Zama LP had a significant investment in UEC common shares listed on the Tokyo Stock Exchange, and that Zama LP was thus willing to assist in the search for a SPAC partner as it expected such a transaction to improve the value of the UEC common shares.

32.     However, UEC has come to learn that on at least one occasion, Eiseman and Zama LP demanded of a potential SPAC sponsor that, *as a condition of introducing that sponsor to UEC, the sponsor agree to share with Zama LP 20% of the sponsor compensation, or "promote," to be earned upon the closing of any eventual SPAC transaction with UEC.* UEC did not enter into a transaction with that SPAC.

33.     Following that, in or around July 2021, Eiseman introduced UEC to 26 Capital. After the introduction, UEC and 26 Capital began discussions about a potential transaction. On or about July 13, 2021, 26 Capital sent UEC a non-binding letter of intent to engage in a SPAC transaction (the "LOI").

34.     The LOI contained only two terms:

> 26 Capital will agree to merge with TRLEI at an enterprise valuation of $2.6B, which valuation excludes the value of the lease rights attached to the undeveloped excess land.
>
> The source of funds to consummate a transaction will come from a combination of (i) cash held in trust at 26 Capital of $275M and/or, (ii) a contemplated Private Investment in Public Equity ("PIPE") of approximately $200M.

35.     Following receipt of the LOI, the parties undertook due diligence and engaged in negotiations on a final merger agreement.

36.     Throughout these negotiations Eiseman repeatedly advised UEC to agree to terms that were unfavorable to UEC, but that would maximize the chances of the transaction closing, even if the transaction would have little or no value for UEC (and, as discussed further below, could have significant downside for UEC and its affiliates, including potential liability in the Philippines and the United States).

37.     Some of these terms were technical and unique to SPAC transactions, with which UEC's management was not familiar and had no experience.  UEC ultimately accepted Eiseman's recommendations, believing that he was a professional advisor with deep knowledge of SPACs and that his interests were aligned with UEC's.

38.     On October 15, 2021, certain of the UEC Parties, including TRA, the Operating Company, the New Parent, and Merger Sub executed an Agreement and Plan of Merger and Share Acquisition with 26 Capital (the "Merger Agreement"), which provided for a business combination involving the UEC Parties and 26 Capital (the "Business Combination").

39.     The structure of the Business Combination involves the indirect conversion of shares of 26 Capital into shares in the New Parent.

40.     UEC has now come to understand, however, that Eiseman and/or the Zama *Defendants had an undisclosed side-deal with 26 Capital* that would provide Eiseman and/or the Zama Defendants with a multi-million-dollar windfall if the Business Combination closed.

41.     Specifically, Zama LP (which is a registered investment advisor but not a registered broker) filed a Form ADV Part 2A with the SEC on or about March 28, 2022 (the "Zama LP Disclosure").  A copy of the Zama LP Disclosure is attached hereto as Exhibit B.  It discloses that

at some time between March 26, 2021 (i.e., after Zama LP signed the First Engagement Letter) and March 28, 2022, Zama LP obtained an interest "in the sponsor of a special [purpose] acquisition company [] through a series of [its] fund which only holds that investment." Ex. B at 4, 9. The Zama LP Disclosure conceded that "[t]here is a risk that the SPAC does not make an acquisition within the allotted time, the investment in the sponsor equity will have no value. Thus, there is the potential for a loss of the entire investment." Ex. B. at 9.

42.     Upon information and belief, the SPAC sponsor in which Zama LP now has an interest is 26 Capital Holdings, the holder of a number of Founder Shares[2] in 26 Capital that will be worth potentially tens of millions of dollars if the Business Combination closes but will be worthless if the Business Combination does not close.

43.     The most recent Form F-4 filing for the New Parent values 26 Capital's Founder Shares at $67.8 million in the event the Business Combination closes. As a hypothetical matter, if Zama LP had an interest worth 20% of 26 Capital's (the same percentage Zama LP demanded from a different potential SPAC sponsor, as discussed above), it would be worth more than $13.5 million, outstripping any compensation the Defendants could or would ever receive from UEC.

44.     On at least two separate occasions—on December 16, 2022, and again on January 6, 2023—Eiseman was asked in writing whether Zama or its affiliates have a separate engagement with any party other than UEC and its affiliates, and whether any type of payment is due to Zama or its affiliates from such other party upon successful closing of the Business Combination. On both occasions, Eiseman refused to answer the question in his written response, rather providing non-responsive statements about other matters.

---

[2] "Founder Shares" are sold to a SPAC sponsor at a severely discounted price, here $25,000.

**B.**      **Eiseman Forms a New Zama Entity Days After the Merger Agreement
Is Signed to Profit From the Business Combination**

45.      In the days following the signing of the Merger Agreement Eiseman formed at least

one, and perhaps multiple, new Zama entities through which he could collect substantial fees from

UEC related to the Business Combination.  As detailed below, the entity is notable in several

respects including:  (i)  it uses Eiseman's personal address, a departure from other Zama entities

that are associated with a commercial address in New York City, (ii) Eiseman was the sole person

to correspond with UEC regarding the entity's compensation, (iii) the Zama Disclosure does not

reference the existence of the new entity, and (iv) if the new entity was formed by Eiseman to

benefit himself personally, it would run afoul of restrictions on his business activities described in

a public filing by Zama LP.

46.      On October 19, 2021—four days after the Merger Agreement was signed—Zama

Capital Strategy Advisors L.P. was incorporated as a limited partnership in Delaware.

47.      Records available on the website of the New York Department of State list Zama

LLC—full entity name: Zama Capital Strategy Advisors *LLC*—as being formed in Delaware on

October 19, 2021.

48.      Records available on the website of the Division of Corporations of the State of

Delaware do not include an entity known as Zama Capital Strategy Advisors LLC.

49.      The service address for Zama LLC is Eiseman's personal residence, rather than the

business address for Zama LP (the address that appears in Eiseman's signature block).

50.     On October 28, 2021, UEC executed an engagement with Zama LLC (the "Second Engagement Letter," and with the First Engagement Letter, the "Engagement Letters"). A copy of the Second Engagement Letter is attached hereto as Exhibit C.[3]

51.     Eiseman signed the Second Engagement Letter as Zama LLC's managing partner.

52.     The Second Engagement Letter called for the immediate payment of $2.5 million in cash to Zama LLC. The Second Engagement Letter also contemplated a deferred payment of $7.5 million to Zama LLC to be paid in cash or stock of UEC or of New Parent following the successful consummation of the Business Combination, including the New Parent's stock becoming listed on a U.S. exchange.

53.     On November 10, 2021, Zama LLC sent UEC an invoice for the $2.5 million payment. The address listed for Zama LLC on the invoice is the same address as Eiseman's personal residence, and the bank that the invoice directed payment to is 0.3 miles away from Eiseman's personal residence.

54.     In contrast to most other communications involving a Zama Defendant, correspondence related to the Second Engagement Letter and the Zama LLC invoice came solely from Eiseman and did not include Littlejohn.

55.     The Zama LP Disclosure, which was filed on March 28, 2022, does not reference the existence of Zama LLC.

56.     On the same day it filed the Zama LP Disclosure, Zama LP filed a Form ADV Part 2B with the SEC that provides information regarding Eiseman's role at Zama LP (the "Eiseman

---

[3] To the extent Zama LLC was not a properly existing entity at the time UEC entered into the Second Engagement Letter, UEC reserves all rights and arguments with respect to whether the Second Engagement Letter is a binding and enforceable contract.

Disclosure").[4]  A copy of the Eiseman Disclosure is attached hereto as Ex. D.  The Eiseman Disclosure states that "[a]s per the strategic relationship agreement with the Funds managed by [Zama LP], Mr. Eiseman may not engage in other activities, including providing investment management and advisory services to other funds and accounts, and shall be required to refrain from any such activity, to earn profits from any such activity, or to devote a particular amount of time or efforts to the management of the funds and the accounts managed by Zama Capital and related affairs." Ex. D at 1.

57.     The Eiseman Disclosure further states that "Mr. Eiseman is restricted from forming managed accounts or other investment partnerships or funds, from entering into other investment advisory relationships, or from engaging in other business activities." *Id.*

58.     The Second Engagement Letter included a confidentiality provision that was substantially similar to that in the First Engagement Letter.

59.     The Second Engagement Letter included an appendix that listed the primary work that would be undertaken related to the Business Combination.  Among these were tasks related to marketing the Business Combination to investors, all of which were, at least in part, assigned to Zama LLC.  An excerpt of the Appendix is reproduced below:

| *Communication/Marketing Materials Post-Signing* | |
|---|---|
| Prepare talking points/FAQ's for discussions with key investors | UEC/Zama |
| Media plan development | UEC/Zama/26 Capital |
| Review roadshow presentation materials/FAQ's and iterative review with SPAC | UEC/Zama/26 Capital |
| Prepare Investor Buy-Side Target List | UEC/Zama/26 Capital |
| Prepare Sell-Side Target List | UEC/Zama/26 Capital |
| Reach out to target investors for participation in roadshow meetings | UEC/Zama/26 Capital |
| Schedule roadshow meetings | UEC/Zama/26 Capital |
| Prepare investor day presentation and iterative review with SPAC | UEC/Zama/26 Capital |
| Prepare materials for posting on UEC Manila investor website | UEC/Zama |
| Select vendors for go-forward public earnings communications | UEC/Zama |

---

[4] The Zama LP Eiseman Disclosure is dated March 20, 2019, but the SEC's Investment Adviser Public Disclosure shows the filing was submitted on March 28, 2022.

**C.      The UEC Parties and 26 Capital Pursue the Business Combination But Progress Stalls Because the Philippine Supreme Court Issues a Status Quo Ante Order and Kazuo Okada Illegally and Violently Takes Over the Resort and Operating Company**

60.      After executing the Merger Agreement, the UEC Parties and 26 Capital diligently pursued closing.

61.      Because the Business Combination would involve the issuance of U.S.-listed securities, the New Parent was required to file a registration statement with the SEC (on SEC Form F-4) pursuant to which those securities would be registered for sale.

62.      A draft registration statement was confidentially filed with the SEC on or about December 13, 2021.  After receiving comments from the SEC and revising the F-4 registration statement, the New Parent publicly filed a Form F-4 on February 22, 2022, which received additional comments from the SEC.  On or about March 31 and April 23, 2022, first and second amendments to the Form F-4 were filed, each of which received comments from the SEC.

63.      Throughout the time that the UEC Parties and 26 Capital pursued the Business Combination, Kazuo Okada made multiple attempts to regain control of the Operating Company, including pursuing a lawsuit in the Philippine court system challenging his 2017 ouster from the Operating Company.

64.      Okada's lawsuits regarding the same issue in Japan and Hong Kong had already failed.  In the Philippines, the Regional Trial Court had ruled in favor of the Operating Company and that ruling was upheld by a Court of Appeals.  But on April 27, 2022, in a last-ditch supplemental petition for certiorari to the Philippine Supreme Court, Okada procured (*ex parte*) the Status Quo Ante Order ("SQAO") that directed the parties to temporarily observe the status quo prevailing prior to Okada's ouster from the Operating Company five years earlier.

14

65.     On May 1, 2022, the Operating Company received a notice from Okada's lawyers that, based on the SQAO, he was purporting to control the Operating Company and intended to hold a shareholders' meeting the next morning. Okada subsequently claimed to install a new board of directors in the Operating Company without requisite authority or process.

66.     On or about May 2, 2022, Okada's agent arrived at the Resort with his lawyers and attempted to take control of the property. The Operating Company's representatives refused, and Okada's agents left the property peacefully.

67.     The UEC Parties informed the Zama Defendants and 26 Capital about these developments on or about May 9, 2022. By May 12, 2022, rumors about the SQAO reached the market, with the Parent Company's publicly traded stock price taking a significant negative hit.

68.     Despite the obvious significance of this issue, 26 Capital, Eiseman, Littlejohn, and the Disloyal Director took actions designed to close the Business Combination at any cost, even if it meant New Parent violating U.S. securities laws.

69.     For example, on or about May 17, 2022, Eiseman, who is not an attorney, wrote to the Disloyal Director and provided advice on New York, U.S. federal securities, and Philippine law issues related to the Merger Agreement and required disclosures (including the meaning of the SQAO and required U.S. federal securities law disclosures), and suggested the SQAO is irrelevant to the Merger Agreement because "the SPAC merger is with [the New Parent], not [the Operating Company]" and "the transfer of [the Operating Company's] legal ownership is not a condition to close."

70.     Eiseman wrote to the Disloyal Director and again pressured UEC to file an amended Form F-4, irrespective of the recent developments that would be highly material to 26 Capital's

investors and the possibility that closing the Business Combination might be a violation of the SQAO.

71.     Eiseman separately pressured UEC's CFO, writing to him on or about May 24, 2022, that there was "approximately one hour left" for the amended Form F-4 to be signed, and that "failure to file the [Form] F-4 now is a clear breach of the merger agreement that <u>will</u> result in liability, which may also include personal liability." (Emphasis in original.)  When UEC's CFO responded that UEC was still discussing the matter with its counsel, Eiseman wrote back that he would "request to 26 Capital and their lawyers to wait 10 more hours. I believe this is the maximum they can wait, so if you cannot give the go ahead signal in 10 hours from now, I won't be able to keep their lawyers from suing [UEC's President] and UEC's Board. The situation is very very serious."

72.     The pressure campaign from Zama, the Disloyal Director, and 26 Capital resulted in the filing by the New Parent of a third amendment to the Form F-4 on May 25, 2022.

73.     Several days later, on May 31, 2022, scores of Okada's privately hired security guards and police illegally took physical control of the premises of the Resort by force, violently ejecting the Operating Company Management (the "<u>Violent Takeover</u>").

74.     Even after learning of the Violent Takeover, Zama, through Eiseman and Littlejohn, and the Disloyal Director, continued to take actions designed to finalize the Business Combination as soon as possible, prioritizing their individual interests above those of the company they were supposed to serve.  Eiseman was so intent on pushing through the Business Combination that he advised the Disloyal Director that the Violent Takeover was sufficiently disclosed given that the Form F-4 noted that "the former Chairman of TRLEI and UEC, Kazuo Okada, has engaged in, and may continue to engage in, activities that may interfere with UERI's business."

75.     26 Capital, Eiseman and Littlejohn also insisted on making a request to the SEC to have the Form F-4 go effective with no disclosure about the Violent Takeover.  UEC ultimately acceded to these demands to request that the registration statement go effective only after the New Parent's counsel got 26 Capital's counsel to agree that a post-effective amendment with adequate disclosure would be filed before approval of the Business Combination (among other things) was sought from investors in 26 Capital.

**D.     The UEC Parties Regain Control of the Resort and Operating Company but Face Continuing Obstacles to Closing the Business Combination**

76.     While Okada's agents continued their illegal occupation of the Resort, the UEC Parties and 26 Capital executed a June 29, 2022 waiver agreement to extend the termination deadline under the Merger Agreement from June 30, 2022 to October 1, 2022.  The Operating Company Management and the UEC Parties' professionals hoped that additional time would allow the Operating Company to obtain a favorable ruling from the Philippine Supreme Court on the SQAO and resume control of the Resort, paving the way for a responsible closing of the Business Combination.

77.     On September 2, 2022, the legitimate Operating Company Board regained control of the Resort.  Okada was subsequently arrested and is out on bail.  He and several of his associates have been criminally indicted for the Violent Takeover and are being tried in court in the Philippines.

78.     While regaining control of the Resort resolved one major obstacle to closing, numerous other legal and practical obstacles remained, including the need to understand what happened at the Resort during the three-month occupation period following the Violent Takeover. Moreover, the SQAO remained in place, and there was still a concern that closing the Business

Combination could violate the SQAO, potentially subjecting individuals to civil and/or criminal liability.

79.     Another key issue that needed to be resolved was accurately updating the Form F-4, including financial statements, that would be given to investors to provide them with all the information required for them to make an investment decision in connection with their vote on the Business Combination.  Every time the Form F-4 or an amendment is filed with the SEC, as is standard practice under U.S. federal securities laws, the Operating Company was required to obtain a consent from UHY LLP ("UHY"), the Operating Company's and the New Parent's U.S. auditor, for the inclusion of the previously audited financial statements in the F-4 registration statement.

80.     On or about July 2022, UHY informed the Operating Company's management and the Disloyal Director that the UHY Management Committee would have to decide if UHY would continue as an auditor for the Operating Company.  On September 12, 2022, UHY notified UEC in writing that because of the Violent Takeover, no party was allowed to rely on UHY's audit opinions relating to the Operating Company's 2020 and 2021 financial statements.  UHY also insisted on undertaking significant additional audit procedures before it would issue its consent to include their previously issued audit opinion in future Form F-4 filings.  With respect to the 2022 financial statements that would also be required to be included in future Form F-4 filings, UHY informed the UEC Parties that it would revisit whether it could continue acting as auditor after completing the process for the 2020 and 2021 financial statements.

81.     The Operating Company's local Philippine auditor, who audited the Operating Company's financial statements for local Philippine regulatory filings, refused to do any new work until the SQAO was resolved with a final ruling.  As a result, a new Philippine auditor needed to

be engaged to complete the Operating Company's Philippine financial statements for the second quarter of 2022, the third quarter of 2022, and full year 2022.

82.    Given the remaining obstacles caused by the Violent Takeover, the ongoing SQAO, and the approaching October 1, 2022 unilateral termination date under the Merger Agreement, the UEC Parties considered whether to exercise their right to terminate and walk away from the Business Combination.  The President and CFO of the Operating Company, who respectively had prior experience as an auditor and a capital markets lawyer, and who both had prior investment banking experience, had no issue with termination despite the loss of financial incentives they would have received upon a successful closing.  Termination would result in Zama, Eiseman, and Littlejohn losing (i) the $7.5 million success fee due under the Second Engagement Letter, and (ii) the other remuneration that, upon information and belief, Eiseman and Zama stand to gain from 26 Capital.  Together, they began to undertake a series of coordinated and increasingly aggressive actions to ensure they got paid.

**E.    Eiseman, the Disloyal Director and 26 Capital Share Misappropriated Privileged UEC Information and Conspired to Convince the UEC Board to Extend the Merger Agreement's Termination Date**

83.    In early September 2022, Milbank LLP, who was counsel to UEC, drafted two privileged memos for the UEC Board's consideration (the "Milbank Memos") providing legal analysis related to the possible termination of the Business Combination.  In mid-September, UEC's additional outside counsel, Baker & McKenzie ("B&M"), provided the UEC Board with its own memorandum related to the same topic (the "B&M Memo" and together with the Milbank Memos, the "Privileged Memos").

84.    On or about September 20, 2022, the Disloyal Director provided copies of the Privileged Memos to Eiseman and Littlejohn.

85.     On September 20, 2022, Eiseman sent a text message to the Disloyal Director, stating that he had "been reading the Milbank memos" and critiquing their contents. On that same day, Eiseman sent an email to the Disloyal Director with proposed responses to the analysis in the Milbank Memos.

86.     In the days leading up to and following September 20, 2022, Eiseman and the Disloyal Director also discussed communicating with 26 Capital's principal, Ader, on ways to convince the UEC Board to extend the termination date under the Merger Agreement.

87.     Ader also received copies of the Privileged Memos. Upon information and belief, Eiseman, with the knowledge of the Disloyal Director, provided the Privileged Memos to Ader and 26 Capital.

88.     In connection with the September 2022 UEC board meeting, Zama drafted a presentation for the UEC Board (the "September Presentation"), which, among other things, provided advice on the value of New Parent's securities and encouraged UEC to extend the approaching deadline for closing the Business Combination by which UEC would sell some of its stock in New Parent to investors in 26 Capital.

89.     That presentation advised that UEC "has a committed deal at an attractive valuation, and with a high-quality sponsor, that will significantly enhance UEC's market valuation."

90.     The September Presentation stated that the New Parent "is positioned to trade well post-listing" and advised that [Zama] "believe[d New Parent's] share price will steadily appreciate over time . . . ." It further stated that "[t]here is strong market support for [New Parent] to receive a >$2.5B market valuation once listed, providing for stock appreciation potential."

91.     The September Presentation also warned that a "broken deal would cause serious reputational harm for UEC" and "would hurt UEC's stock price . . . ."

92.     The September Presentation additionally stated (incorrectly) that directors of UEC's Board could have extensive personal liability if the Business Combination did not go through: "Based on the lost market value/opportunity cost for a successful de-SPAC, estimated legal damages could be between $160-340M. [26 Capital] may also sue UEC and its directors directly for tortious interference and seek other punitive damages."

93.     A copy of the September Presentation was provided to the UEC Board.

94.     On September 22, 2022 the UEC Board met and decided not to extend the termination date.

95.     Following that meeting, the Disloyal Director, sent the following communication to Eiseman and Ader:

> The board voted not to extend the contract.
>
> But at Monday's meeting, pretend that you were unaware of the board's decision.
>
> Fujimoto [UEC's President] said he would discuss at Monday's meeting whether partnerships could be formed outside of SPAC.
>
> Fujimoto is dishonest and sneaky.
>
> ***Fujimoto told me not to tell anyone because it is insider information, but I will tell you because I consider integrity more important. (emphasis added)***
>
> I will call you later anyway.

96.     Armed with this and other insights (including the Privileged Memos), Eiseman and Ader flew to Tokyo from New York and met with Jun Fujimoto, UEC's President, Kenshi Asano, UEC's CFO, and the Disloyal Director and, over the course of a six-hour-plus meeting, convinced the President and CFO of UEC to immediately hold a board meeting to reverse the UEC Board's

decision and extend the termination date at a September 26, 2022 meeting in Tokyo.  At that meeting, Eiseman made false representations to the President and CFO in numerous respects, including about the purpose of the extension, the timing and difficulty (or lack thereof) of completing the audit work, the scope of the UHY accounting engagement, the implications of extending the termination date, an improper comparable trading valuation analysis, the state of the SPAC market, and the ability and integrity (or lack thereof) of the Operating Company's President and CFO, who had expressed concerns about the increasingly poor performance of the SPAC market.

97.     Eiseman also made statements to the UEC Board regarding the desirability of completing the Business Combination, including that doing so would allow the New Parent to raise as much as it would like because it could sell additional shares with no extra effort.  Eiseman also advised the UEC Board not to pursue a PIPE investment because it would be cheaper to get capital by selling shares once the New Parent was publicly listed in the United States.

98.     One of UEC's concerns was how many 26 Capital shareholders would choose to redeem their shares (when a share is redeemed it reduces the amount of capital going to New Parent).  Ader assured the President and CFO that he expected significant support from the 26 Capital shareholders, and that more than 90% of them would not redeem.  Eiseman supported Ader's view, telling the President and CFO that the Business Combination was attractively priced, which would help limit redemptions.  (As of the date of this complaint, holders of more than 87.5% of 26 Capital's public shares have already redeemed, and the remaining shareholders will be given a chance to redeem in connection with a vote on the Business Combination.)

99.     Eiseman, who, again, is not an attorney, also argued against—and urged the President and CFO to disregard—the legal conclusions contained in the Privileged Memos.[5]

100.    Finally, in a telling slip-up, Eiseman at one point responded to a proposal from the UEC CFO for a stop-gap extension by asking Ader, "would *we* be open to that, Jason?" (emphasis added) despite the fact that Eiseman's duties were to UEC, not Ader or 26 Capital, UEC's counterparty.

101.    Ultimately, as a result of the meeting, UEC's President and CFO agreed to try to convince their board of directors to reconsider and extend the termination deadline.  Eiseman and Ader sought a six-month extension, but the President and CFO knew that timeframe was insufficient to address the various issues caused by the SQAO and the Violent Takeover and instead went with a one-year extension.

102.    The UEC Board agreed to the one-year extension.

**F.      The Zama Defendants Further Breach their Confidentiality Obligations**

103.    After the extension was announced, Defendants continued and expanded their efforts to pressure Plaintiffs to prioritize closing the Business Combination above all other priorities, including audit and financial reporting work necessary to keep UEC from being delisted with the Tokyo Stock Exchange.

104.    When the pressure campaign did not succeed as fast as they wished, Defendants concocted a scheme to have financial statements for prepared without the knowledge of the Operating Company and New Parent.

---

[5] Additionally, at the meeting Ader, who is also not an attorney, told UEC's President and CFO that the directors of the UEC board (including the President and CFO) were subject to personal liability in Delaware if the Business Combination went awry.  This statement, like the similar one in Zama's September Presentation, was false.

105.    On or about December 2 and 4, 2022, the lead person on the auditing team at UHY, Daniel Jones, contacted and informed the Operating Company's President that a consultant of 26 Capital had been retained for handling the pro formas for the Form F-4, Calabrese Consulting, LLC ("Calabrese"), and was now preparing the financial statements for the six-month period ending June 30, 2022 and the management's discussion and analysis section ("MD&A") for inclusion in the Form F-4.

106.    The Operating Company's President was unaware of, and had not approved, the hiring of Calabrese to prepare the financial statements for the Operating Company.  As one of the primary fiduciaries responsible for the Operating Company and New Parent's financial statements, the Operating Company's President was disturbed to learn that financial statements and MD&A were being prepared without his or his staff's involvement or knowledge.

107.    The preparation of financial statements and the MD&A without Operating Company Management's involvement posed serious risks for UEC and the other UEC Parties.

108.    In the referenced communications, Jones informed the Operating Company's President that Zama LLC had authorized the sharing of the Operating Company's confidential information with Calabrese and instructed UHY to share said information with Calabrese.

109.    The existence of "shadow financials" prepared without management's involvement, consent, or even knowledge presented obvious risk.  Accordingly, the Operating Company's President reported Calabrese's involvement to UEC and the Operating Company Board.  The Operating Company Board voted on December 12, 2022 to investigate how a consultant that it had not engaged to prepare its financial statements secured access to its confidential financial information and why it was preparing financial statements without engaging with management or its accounting staff.

110.    On or about December 5, 2022, the Disloyal Director emailed Zama, including Eiseman, regarding the information provided by UHY and asked if Eiseman had approved the hiring of Calabrese for UHY. On or about the same day, Littlejohn responded, denying that Zama had authorized UHY to share confidential information with Calabrese, and claiming that Calabrese was retained by 26 Capital.

111.    On or about December 6, 2022, Jones forwarded the Operating Company's President an email in which Littlejohn received an information request from Calabrese related to the Operating Company's Q2 2022 financial statements and Littlejohn responded that Zama would "work on getting you this information either directly or make sure UHY has permission to share what they have from their work/the dataroom."

112.    Also, on or about December 6, 2022, Littlejohn emailed Calabrese and asked Calabrese to circulate draft financial reports, an instruction that directly contradicts Zama's subsequent denial to UEC that it had not authorized the sharing of its financial information.

113.    As part of its investigation, on December 17, 2022, Milbank sent a letter to Eiseman detailing the ways in which Zama LLC had breached its confidentiality obligations to Plaintiffs, and asked Zama LLC to confirm whether it "or its affiliates have a separate engagement with any party other than the Companies, and whether any type of payment is due to Zama or its affiliates from such other party upon successful closing of the SPAC Transaction."

114.    On December 23, 2022, Eiseman responded to Milbank by email. Eiseman claimed that Zama had not breached the terms of the Second Engagement Letter, but refused to address the question of whether Zama LLC or its affiliates had a separate engagement with any other party, or whether it would be due any payment from another party upon closing of the Business Combination.

115.    On January 6, 2023, Milbank responded to Eiseman, asking again whether the Zama Defendants or their affiliates had a separate arrangement from which it could profit from the successful closing of the SPAC transaction.  On January 13, 2023, Eiseman responded by email, and again refused to address the question.

116.    Upon information and belief, Eiseman refused to answer the question because he did not want to disclose that—entirely unbeknownst to the UEC Parties—Zama LP or its affiliates had a secret interest in 26 Capital Holdings and stood to be compensated handsomely by the UEC Parties' counterparty upon closing of the Business Combination.

### G.      The Zama Defendants and Eiseman Continue to Conspire with the Disloyal Director

117.    On January 31, 2023, Asano, UEC's CFO and a member of the UEC Board, sent a letter to the Zama Defendants outlining UEC's concern that they had shared UEC's confidential information without authorization.

118.    In response, on or about January 31, 2023, Eiseman prepared a draft email that he intended to send to Asano, which he sent to the Disloyal Director at the Disloyal Director's personal e-mail account.  In that same message, Eiseman referenced a separate conversation with the Disloyal Director in which Eiseman and the Disloyal Director discussed papering the record on the Disloyal Director's work email account, seeking to establish that the Disloyal Director properly directed Zama LLC's activities.  The text of the e-mail is reproduced below:

Takeuchi-san [i.e, the Disloyal Director],

Please find below the proposed email response to Asano-san's letter.  Please let us know if this works.  We very much appreciate your help resolving this issue.

"Dear Asano-san,

We have been working very hard for many months to help UEC with the processes required to complete the SPAC transaction.  We have not ceased in our dedication to this work despite the assignment requiring much more time and

effort on our part than was originally expected given that the transaction was supposed to have closed last June.  Considering the circumstances, we were very upset to receive this letter from you because it appears to be accusing Zama.  Before any of your questions can be addressed, we would need to understand the basis for your accusations.

I would like to have a zoom meeting with you where our respective concerns about the situation can be addressed.  Please let me know some times that would work for you to have this meeting.

Best regards,

Alex"

***Separately, as I mentioned when we spoke, I will send a separate email to your work email so that we have for our records that it is ok for us to continue to take direction from you with regard to this assignment.*** (emphasis added)

Best regards,

Alex

Alexander H Eiseman
Managing Partner
Zama Capital
900 Third Avenue Suite 201
New York, NY 10022
(o) 212-418-1235
(c) 914-843-7668
alex@zamacap.com

119.    On or about January 31, 2023, the Disloyal Director responded that Eiseman's proposed email was "totally fine for the first step."

120.    On February 2, 2023, Eiseman, using his Zama email address, responded to Asano's letter with an identical message to the draft shared with the Disloyal Director.

**H.    26 Capital and the UEC Parties Engage in Litigation in Delaware**

121.    On February 2, 2023, 26 Capital filed a lawsuit in the Delaware Court of Chancery against various UEC subsidiaries in an effort to force the Business Combination to close.  It is pending under the caption *26 Capital Acquisition Corp. v. Tiger Resort Asia Ltd. et al.*, C.A. No. 2023-0128-JTL.

122.    On February 20, 2023, those UEC subsidiaries filed counterclaims against 26 Capital, also in the Delaware Court of Chancery.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of the Exchange Act**
**(By Plaintiff UEC Against Zama LP and Zama LLC)**

123.    The allegations of each of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

124.    Section 15(a) of the Exchange Act makes it unlawful for an unregistered broker to "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a).

125.    At all relevant times, Zama LP was acting as a broker for UEC in sourcing a potential SPAC transaction.  In particular, Zama LP and Eiseman actively advised UEC on whether to sell its securities to 26 Capital by engaging in the SPAC transaction.  Zama LP and Eiseman thereafter actively participated in the solicitation of potential investors to invest in UEC and/or its subsidiaries through a SPAC transaction.

126.    Zama LP is not a registered broker as required by the Exchange Act, 15 U.S.C. § 78o.

127.    Contracts made in violation of the Exchange Act are void pursuant to 15 U.S.C. § 78cc.

128.    The First Engagement Letter is void.

129.    The structure of the Business Combination involves the indirect conversion of shares of 26 Capital into shares in the New Parent.

130.    In performing its duties under the Second Engagement Letter, Zama LLC acted as a broker under the Exchange Act because it was engaged in the business of effecting transactions in securities for the account of others, because it, among other things, took actions to facilitate the closing of the Business Combination, gave UEC and the UEC Board advice with the intention of facilitating the closing of the Business Combination, undertook to market the transaction to investors, and agreed to receive compensation based on the success of the transaction.

131.    Zama LLC is not a registered broker as required by the Exchange Act, 15 U.S.C. § 78o.

132.    Contracts made in violation of the Exchange Act are void pursuant to 15 U.S.C. § 78cc.

133.    The Second Engagement Letter is void.

134.    By reason of the foregoing, Plaintiff UEC is entitled to a judgment voiding the First Engagement Letter and the Second Engagement Letter and directing Defendant Zama LLC to repay all monies paid to it pursuant to the Second Engagement Letter.

### SECOND CLAIM FOR RELIEF
**Violation of the Investment Advisers Act**
**(By Plaintiff UEC Against Zama LLC)**

135.    The allegations of each of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

136.    The Investment Advisers Act makes it unlawful "for any investment adviser, unless registered under this section, to make use of the mails or any means or instrumentality of interstate commerce with his or its business as an investment adviser."

137.    In performing its duties under the Second Engagement Letter, Zama LLC acted as an investment adviser under the Investment Advisers Act because it, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of purchasing, or selling securities, by, among other things, advising UEC on selling securities that it owns in the New Parent.

138.    Zama LLC also was responsible for reviewing roadshow materials, preparing investor and buy-side target lists, preparing a sell-side target list, reaching out to target investors for participation in roadshow meetings, scheduling roadshow meetings, preparing investor day presentations, among other things.

139.    Zama LLC is not a registered investment adviser.

140.    Contracts made in violation of the Investment Advisers Act are void pursuant to 15 U.S.C. § 80b–15(b).

141.    By reason of the foregoing, Plaintiff UEC is entitled to a judgment voiding the Second Engagement Letter and directing Defendant Zama LLC to repay all monies paid to it pursuant to the Second Engagement Letter.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**
**(By Plaintiff UEC Against Defendant Zama LLC, Eiseman, Littlejohn, John Doe Entity 1)**

142.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

143.    Pursuant to the Second Engagement Letter, Plaintiff UEC paid to Defendant Zama LLC a sum of not less than $2.5 million.

144.    It would be against equity and good conscience to permit any of the herein named Defendants to retain the money paid by Plaintiff UEC pursuant to the Second Engagement Letter.

### FOURTH CLAIM FOR RELIEF
**Breach of Fiduciary Duties**
**(By Plaintiff UEC Against the Zama Defendants)**

145.    The allegations of each of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

146.    The Zama Defendants owed a fiduciary duty to UEC.  The Zama Defendants were at all times acting as agents of UEC.

147.    Separately, the Engagement Letters, by their nature and structure, created a principal-agent relationship between UEC and the Zama Entities that imposed fiduciary duties upon the Zama Entities.[6]

148.    Acting with bad faith, willfulness, recklessness, and/or gross negligence, the Zama Defendants, among other things, demanded returns from potential SPAC sponsors in exchange for an introduction to UEC, inappropriately advocated for 26 Capital, UEC's counterparty, in negotiating the terms of the Merger Agreement, misled the Disloyal Director regarding U.S. securities laws' disclosure requirements in connection with preparation of a filing with the SEC, worked with the Disloyal Director, 26 Capital, and Ader to close the transaction even though it is not in UEC's best interest to do so, provided Ader with confidential information, including the Privileged Memos, conspired with Ader and the Disloyal Director to convince the UEC Board to extend the Termination Date against UEC's own interest, participated in the unauthorized sharing of confidential information with Calabrese, and worked with 26 Capital and Ader to secretly have Calabrese create shadow financial statements solely for the purpose of pushing through the

---

[6] The Engagement Letters purport to disclaim fiduciary or other duties.  New York law, however, recognizes that such disclaimers are not dispositive.  *See, e.g.*, *Veleron Holding, B.V. v. Morgan Stanley*, 117 F.Supp.3d 404, 452 (S.D.N.Y. 2015) ("[W]here a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it.")

transaction faster to get their compensation, ignoring the interests of their fiduciary.

149. By reason of the foregoing, the Defendants breached their fiduciary obligations to UEC.

150. UEC has suffered damages proximately caused by the Defendants' breach of their fiduciary duties to UEC.

**FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting a Breach of Fiduciary Duty)**
**(By Plaintiffs New Parent and Operating Company Against All Defendants)**

151. The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

152. As a board member, the Disloyal Director owed a fiduciary duty to the New Parent and the Operating Company.

153. Acting with bad faith, willfulness, recklessness, and/or gross negligence, the Defendants, among other things, inappropriately advocated for 26 Capital, UEC's counterparty, in negotiating the terms of the Merger Agreement, misled the Disloyal Director regarding U.S. securities laws' disclosure requirements in connection with preparation and the filing of New Parent's F-4 registration statement with the SEC, worked with the Disloyal Director, 26 Capital and Ader to close the transaction even though it is not in UEC's best interest to do so, provided Ader with confidential information, including the Privileged Memos, conspired with Ader and the Disloyal Director to convince the UEC Board to extend the Termination Date against UEC's own interest, participated in the unauthorized sharing of confidential information with Calabrese, and worked with 26 Capital and Ader to secretly have Calabrese create shadow financial statements solely for the purpose of pushing through the transaction faster to get their compensation, ignoring the interests of their fiduciary.

154.    By reason of the foregoing, the Defendants aided and abetted the Disloyal Director in the breach of his fiduciary obligations to the New Parent and the Operating Company.

155.    The New Parent and the Operating Company have suffered damages proximately caused by the Defendants' aiding and abetting of the Disloyal Director's intentional breach and/or reckless disregard of his fiduciary duties to Plaintiffs.

### SIXTH CLAIM FOR RELIEF
#### (Negligence)
#### (By Plaintiff UEC Against the Zama Defendants)

156.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

157.    The Zama Defendants owed a duty of care to UEC.  The Engagement Letters, by their nature and structure, created a principal-agent relationship between UEC and the Zama Entities that imposed a duty to act with reasonable diligence in fulfilling their obligations on the Zama Entities.

158.    Acting with negligence, the Zama Defendants, among other things, demanded returns from potential SPAC sponsors in exchange for an introduction to UEC, inappropriately advocated for 26 Capital, UEC's counterparty, in negotiating the terms of the Merger Agreement, misled the Disloyal Director regarding U.S. securities laws' disclosure requirements in connection with preparation of a filing with the SEC, worked with the Disloyal Director, 26 Capital and Ader to close the transaction even though it is not in UEC's best interest to do so, provided Ader with confidential information, including the Privileged Memos, conspired with Ader and the Disloyal Director to convince the UEC Board to extend the Termination Date against UEC's own interest, participated in the unauthorized sharing of confidential information with Calabrese, and worked with 26 Capital and Ader to secretly have Calabrese create shadow financial statements solely for the purpose of pushing through the transaction faster to get their compensation.

159.    By reason of the foregoing, the Defendants negligently breached their duty of care to UEC.

160.    UEC has suffered damages proximately caused by the Defendants' negligence.

**SEVENTH CLAIM FOR RELIEF**
**(Conspiracy)**
**(By Plaintiffs Against All Defendants)**

161.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

162.    As described in the preceding allegations, Defendants intentionally and knowingly committed acts in furtherance of a conspiracy with the Disloyal Director and/or 26 Capital and/or Ader to, among other things, inappropriately advocate for 26 Capital, UEC's counterparty, in negotiating the terms of the Merger Agreement, mislead the Disloyal Director regarding U.S. securities laws' disclosure requirements in connection with preparation of a filing with the SEC, work with the Disloyal Director, 26 Capital and Ader to close the transaction even though it is not in UEC's best interest to do so, provided Ader with confidential information, including the Privileged Memos, conspire with Ader and the Disloyal Director to convince the UEC Board to extend the Termination Date against UEC's own interest, participate in the unauthorized sharing of confidential information with Calabrese, and work with 26 Capital and Ader to secretly have Calabrese create shadow financial statements solely for the purpose of pushing through the transaction faster to get their compensation, ignoring the interests of their fiduciary.

163.    As a result of the Defendants' conspiracy, Plaintiffs have suffered damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Contract)
### (By Plaintiff UEC Against the Zama Defendants)

164.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

165.    The Engagement Letters are valid contracts.

166.    UEC has fulfilled its obligations with respect to the Engagement Letters.

167.    The Zama Defendants breached the Engagement Letters by, among other things, conspiring with the Disloyal Director to inappropriately advocate for 26 Capital, UEC's counterparty, in negotiating the terms of the Merger Agreement, working with the Disloyal Director, 26 Capital and Ader to close the transaction even though it is not in UEC's best interest to do so, participating with the Disloyal Director in the leak of confidential information to Ader, conspiring with Ader and the Disloyal Director to convince the UEC Board to extend the Termination Date against its own interest, participated in the unauthorized sharing of confidential information with Calabrese, and working with 26 Capital and Ader to secretly have Calabrese create shadow financial statements solely for the purpose of pushing through the transaction faster to get their compensation, ignoring the interests of their fiduciary

168.    The Zama Defendants' breach has damaged, and will continue to damage UEC.

169.    As a result of the Zama Defendants' breach, Plaintiffs have suffered damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (By Plaintiff UEC Against the Zama Defendants)

170.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

171.    The Engagement Letters are valid contracts.

172.    The Zama Defendants have acted in a manner that has deprived UEC of the right to receive the benefits owing to it under the Engagement Letters by, among other things, conspiring with the Disloyal Director to inappropriately advocate for 26 Capital, UEC's counterparty, in negotiating the terms of the Merger Agreement, working with the Disloyal Director, 26 Capital and Ader to close the transaction even though it is not in UEC's best interest to do so, participating with the Disloyal Director in the leak of confidential information to Ader, conspiring with Ader and the Disloyal Director to convince the UEC Board to extend the Termination Date against its own interest, participated in the unauthorized sharing of confidential information with Calabrese, and working with 26 Capital and Ader to secretly have Calabrese create shadow financial statements solely for the purpose of pushing through the transaction faster to get their compensation, ignoring the interests of their fiduciary.

173.    Plaintiffs have suffered damages proximately caused by the Zama Defendants' breach of the implied covenant of good faith and fair dealing.

## TENTH CLAIM FOR RELIEF
### (Declaratory Relief)
### (By UEC Against Zama Defendants)

174.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

175.    The First Engagement Letter and the Second Engagement Letter each contain a substantially similar indemnification provision (the "Indemnification Provisions").    The Indemnification Provisions state, in relevant part, that indemnification "shall not apply with respect to any Losses to the extent such Losses are finally judicially determined to have resulted from the gross negligence or willful misconduct of" the indemnified party.

176.    As set forth above, the Zama Defendants and Eiseman have acted with gross negligence and/or willful misconduct with respect to their obligations under the Engagement Letters.

177.    By reason of the foregoing, Plaintiffs are entitled to a judgment declaring that the Zama Defendants are not entitled to indemnification pursuant to the Engagement Letters for any losses arising from the events herein described.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.  That the Court enter judgment awarding Plaintiffs damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages Plaintiffs suffered as a result of Defendants' conduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

B.  That the Court enter judgment voiding the First Engagement Letter and the Second Engagement Letter, and ordering Defendants to disgorge and forfeit all compensation and other monies paid to them by Plaintiffs and their affiliated entities for services performed pursuant to the Second Engagement Letter;

C.  That the Court order Defendants to disgorge and forfeit all compensation and other monies paid to them by Plaintiffs and their affiliated entities in the period of Defendants' disloyal conduct;

D.  That the Court award declaratory relief that no money is owed pursuant to the Indemnity Provisions;

E.  That the Court award Plaintiffs its costs of suit, including reasonable attorneys' fees and expenses; and

F.   That the Court award such other and further relief as the Court may deem just and

proper.

Dated: March 13, 2023
New York, New York

Respectfully submitted,

By: _____

Daniel M. Perry
Grant R. Mainland
Jed M. Schwartz
Andrew L. Porter
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
dperry@milbank.com
gmainland@milbank.com
jschwartz@milbank.com
aporter@milbank.com

*Attorneys for Plaintiffs*