# **Exhibit 1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| RIMU CAPITAL LTD., | No: |
| *Plaintiff*, | **COMPLAINT** |
| vs. | |
| JASON ADER, SPRINGOWL ASSET MANAGEMENT LLC, SPRINGOWL ASSOCIATES LLC, ADER FUND MANAGEMENT LLC, and 26 CAPITAL HOLDINGS LLC, | |
| *Defendants*. | |

Plaintiff Rimu Capital Ltd. ("Rimu"), by and through its undersigned attorneys, as and for its Complaint against defendants Jason Ader ("Ader"), SpringOwl Asset Management LLC ("SpringOwl AM"), SpringOwl Associates LLC ("SpringOwl Associates" and, collectively with SpringOwl AM, "SpringOwl"), Ader Fund Management LLC ("Ader FM"), and 26 Capital Holdings LLC ("26 Holdings"), alleges as follows:

## I.      SUMMARY OF THE ACTION

1.      This is a case of fraud, self-dealing, and breach of fiduciary duty by a trusted financial adviser. Rimu placed its trust and confidence in Jason Ader and his registered investment advisory firm, SpringOwl. Adler and SpringOwl used their positions of trust and confidence to fraudulently induce Rimu to "invest" $25 million in 26 Holdings in a transaction that, Ader said, offered a substantial opportunity for a large return. Ader and SpringOwl, however, did not disclose that Ader was on the other side of the transaction, selling his own personal interest in 26 Holdings

to his client, and that the proposed transaction was designed and implemented to enable Ader to simply pocket Rimu's $25 million for himself.

2.     Specifically, Ader and SpringOwl did not disclose that the $25 million "investment" in 26 Holdings was not going to fund the merger that he described or even to fund 26 Holdings. Instead, immediately after Ader convinced Rimu to transfer $25 million to 26 Holdings, Ader, as Manager of 26 Holdings, authorized and took a "distribution" of $28 million to himself. In doing so, Ader secretly cashed out of his personal investment in 26 Holdings for an enormous gain while leaving Rimu, his investment advisory client, with the risky investment that Ader himself was not willing to hold. Ader did not disclose any of these facts to Rimu.

3.     After Ader defrauded Rimu into funding his lucrative self-authorized payday, Ader stubbornly refused to provide meaningful answers to questions about the transaction and concealed facts concerning his windfall.

4.     In order to accomplish this fraud, Ader and SpringOwl misrepresented and omitted essentially every material fact about his investment recommendation, including: (i) how they would profit from the transaction; (ii) that they sold similar interests—also owned by Ader—only a short time earlier to another entity for a fraction of the cost; (iii) that Ader secretly retained 100% of the "Residual Percentage" in 26 Holdings, despite the fact that 26 Holdings' Operating Agreement required that the "Residual Percentage" be proportionate to each member's Capital Contribution; (iv) a contract between Ader's firm, SpringOwl, and another of Rimu's trusted advisers to split fees earned from Rimu; and (iv) fabricated "high demand" and the existence of "other investors" in the same transaction.

5.     As a result, Rimu is entitled to rescission of its investment advisory agreement with SpringOwl on the grounds that these investment advisers committed fraud. In addition, Ader and

SpringOwl are liable to Rimu for damages due to their fraud, negligent misrepresentation, and breaches of fiduciary duty.

## II.  <u>JURISDICTION AND VENUE</u>

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claim under § 206 of the Investment Advisers Act of 1940 ("<u>Investment Advisers Act</u>"), 15 U.S.C. § 80b-6, arises under the laws of the United States.

7.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's non-federal claims because such claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.     This Court has personal jurisdiction over defendants, and venue is proper in this District, because:

a.     the Subscription Agreement (as defined below) provides that:

"Each party irrevocably consents to being served with legal process issued (including via electronic mail) from the state and federal courts located in the state of New York and irrevocably consents to the exclusive personal jurisdiction of the federal and state courts situated in the state of New York. The parties irrevocably waive any objections to the personal jurisdiction of these courts. Said courts shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions, of any kind or manner, which in any way relate to this agreement or the investor's investment in the company. The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds." (Original in all capital letters.)

b.     The Investment Management Agreement (as defined below) provides that:

"The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York. The parties irrevocably waive any objections to the

personal jurisdiction of these courts. The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement. Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it). The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds."

9.      Pursuant to 28 U.S.C. § 1391, venue also is proper in this District because a substantial part of the events and omissions giving rise to the claims occurred in this District.

III.    **PARTIES**

10.     Rimu is a British Virgin Islands Company with a principal place of business located in Nassau, Bahamas. Rimu's investments are managed by a family office ("MGFO").

11.     Upon information and belief, Ader is an individual and is a resident of New York or Florida.

12.     Upon information and belief based on public filings, SpringOwl AM is a Delaware limited liability company with a place of business located at 701 Brickell Avenue, Suite 1550, Miami, Florida 33131 and/or at 767 Third Avenue, New York, New York 10017, and an address registered with the New York Secretary of State as 1370 Avenue of the Americas, 28th Floor, New York, New York 10019. Upon information and belief based on public filings, the members of SpringOwl AM are Ader Investment Management, LLC and Andrew Michael Wallach. Upon information and belief based on public filings, Ader is the sole member of Ader Investment Management LLC.

13.     Upon information and belief based on public filings, SpringOwl Associates is a New York limited liability company with a place of business located at 701 Brickell Avenue, Suite 1550, Miami, Florida 33131, and an address registered with the New York Secretary of State as 767 Third Avenue, 32nd Floor, New York, New York 10017. Upon information and belief based on public filings, the sole member of SpringOwl Associates is SpringOwl AM.

14.     Upon information and belief based on public filings, Ader FM is a Delaware limited liability company which, at relevant times, had an office at 767 Third Avenue, New York, New York 10017. Upon information and belief based on public filings, Ader is the sole member of Ader FM.

15.     26 Holdings is a Delaware limited liability company with a principal place of business located at 701 Brickell Avenue, Suite 1550, Miami, Florida 33131. At all relevant times, Ader has been, and remains, Manager of 26 Holdings.

### *Relevant Non-Party*

16.     26 Capital Acquisition Corp. ("26 Acquisition") is a publicly traded Delaware corporation with a principal place of business located at 701 Brickell Avenue, Suite 1550, Miami, Florida 33131. At all relevant times, Ader has been, and remains, 26 Acquisition's Chief Executive Officer.

17.     Upon information and belief, SpringOwl AM, SpringOwl Associates, Ader FM, 26 Holdings, and 26 Acquisition are under common control, all owned or controlled directly or indirectly by Ader.

## IV.   FACTS COMMON TO ALL CAUSES OF ACTION

### A.   Rimu's Relationship of Trust and Confidence with Ader and SpringOwl.

18.     In August 2018, SpringOwl Associates entered into an Investment Management Agreement with Rimu ("Investment Management Agreement").

19.     Under the Investment Management Agreement, SpringOwl Associates agreed to act as an investment adviserwith respect to, and managed for Rimu, a designated investment in the securities of a specified publicly traded corporation ("Preexisting Investment").

20.     Under the Investment Management Agreement, SpringOwl Associates was granted "the sole authority and responsibility for managing the [Preexisting Investment], on a discretionary basis, in accordance with [SpringOwl Associates'] best judgment" limited only by the requirements that the Preexisting Investment be limited to "various types of securities" issued by the specified publicly traded company and that "[a]ll investments in the Account shall, at all times, conform to, and be in accordance with, any requirements imposed by applicable law."

21.     Pursuant to the terms of the Investment Management Agreement, the fees to be paid by Rimu for SpringOwl Associates' investment adviser services were an "Incentive Fee calculated as a percentage of the realized and unrealized net capital appreciation of [the Preexisting Investment]."

22.     Pursuant to the terms of the Investment Management Agreement, the fees to be paid by Rimu for SpringOwl Associates' services under the Investment Management Agreement were payable to Ader FM.

### B.   26 Capital Holdings LLC & 26 Capital Acquisition Corp.

23.     While SpringOwl Associates was acting as investment adviserto Rimu under the Investment Management Agreement, SpringOwl and Ader recommended and advised Rimu that

it should invest in common stock and warrants issued by 26 Acquisition, a special purpose acquisition company – a/k/a "SPAC" or "blank check company."

24.     In the typical scenario, a SPAC is formed by a sponsor then raises capital in an initial public offering ("IPO"). Its IPO units customarily are sold for $10 each and consist of a share and a fraction of a warrant (or, alternatively, a warrant to purchase a fraction of a share). The IPO proceeds are held in trust for the benefit of the SPAC's public stockholders, who have a right to redeem their shares after a merger target is identified. These redemption rights essentially guarantee public IPO investors a fixed return.

25.     The sponsor, most often a limited liability company, is responsible for administering the SPAC. Sponsors are compensated by a "promote." Though that can take many forms, the "promote" is usually 20% of the SPAC's post-IPO equity—issued as "founder shares"—for a nominal price. The sponsor will also make an investment concurrently with the IPO to cover the SPAC's underwriting fees and other expenses, since those expenses cannot be paid using cash in the trust. A SPAC may also issue new shares as private investment in public equity ("PIPE").

26.     In the typical scenario, the SPAC's charter sets a fixed period to complete a transaction with a yet-to-be-identified private company ("De-SPAC"). The SPAC must liquidate if it fails to merge within that window. In the event of liquidation, the trust distributes its cash (the IPO proceeds plus accrued interest) to the SPAC's public stockholders. In such a scenario, the founder shares held by the sponsor become worthless.

27.     In the transaction at issue in this action, the sponsor is 26 Holdings and 26 Acquisition is the SPAC, formed for the purpose of effecting a merger, capital stock exchange,

asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses ("Initial Business Combination").

28.    Prior to 26 Holdings' initial investment in 26 Acquisition (described below), 26 Acquisition had no assets.

**C.    26 Acquisition's Class A Common Stock.**

29.    On December 23, 2020, 26 Acquisition filed a Form S-1 Registration Statement ("Registration Statement") with the Securities and Exchange Commission ("SEC"). The Registration Statement was declared effective on January 14, 2021.

30.    On January 19, 2021, 26 Acquisition filed a Prospectus [Rule 424(b)(4)] ("Prospectus") with the SEC.

31.    According to the Prospectus, 26 Holdings is "under common control with SpringOwl Asset Management LLC."

32.    According to the Prospectus, 26 Holdings "is majority-owned by [26 Acquisition's] Chairman and Chief Executive Officer, Jason Ader."

33.    Pursuant to the Registration Statement and Prospectus, 26 Acquisition offered for sale in its IPO 24,000,000 units, at $10.00 per unit, each unit consisting of: (a) one share of Class A common stock; and (b) one-half of one redeemable warrant. Each warrant has an exercise price of $11.50 per share, subject to adjustment.

34.    Consistent with the fact that the IPO and SPAC were entirely driven by and under the direct control of Ader, the Nasdaq symbols for the securities being offered were based not on 26 Acquisition's name, but on his name. The symbols are (i) Class A Common Stock: "ADER," (ii) Units: "ADERU," and (iii) Warrants: "ADERW."

**D.    26 Acquisition's Class B Common Stock (Founder Shares).**

35.    In August 2020, shortly after 26 Acquisition was incorporated, it issued 5,750,000 Founder Shares to 26 Holdings amounting to approximately 20% of 26 Acquisition's post-IPO equity for the nominal sum of $25,000, or approximately $0.004 per share.

36.    Upon information and belief, 26 Holdings' initial funding, which it used to acquire the Founder Shares, was provided by a loan from SpringOwl Special Opportunities Fund LP ("SSOF"), an entity affiliated with Ader and under his control.

37.    In January 2021, 26 Acquisition effected a stock dividend of 0.2 shares for each share outstanding, resulting in an aggregate of 6,900,000 Founder Shares outstanding and held by 26 Holdings.

38.    The Founder Shares are identical to the shares of Class A common stock, except that the Founder Shares are: (i) shares of Class B common stock that automatically convert into shares of 26 Acquisition's Class A common stock at the time of an Initial Business Combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights; and (ii) subject to substantial transfer restrictions ("Lock-Up").

39.    With respect to the Lock-Up, 26 Holdings agreed not to transfer, assign or sell any of its Founder Shares until the earlier to occur of: (A) one year after the completion of an Initial Business Combination or (B) subsequent to any Initial Business Combination, (x) if the last sale price of 26 Acquisition's Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after an Initial Business Combination, or (y) the date on which 26 Acquisition completes a liquidation, merger, capital

stock exchange or other similar transaction that results in all of 26 Acquisition's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

40.     26 Holdings and its officers and directors also waived certain rights with respect to the Founder Shares. Specifically, 26 Holdings:

(i)     waived its redemption rights with respect to its Founder Shares and public shares in connection with the completion of an Initial Business Combination;

(ii)     waived its redemption rights with respect to its Founder Shares and public shares in connection with a stockholder vote to approve an amendment to 26 Acquisition's amended and restated certificate of incorporation (A) to modify the substance or timing of 26 Acquisition's obligation to offer redemption rights in connection with any proposed Initial Business Combination or to redeem 100% of 26 Acquisition's public shares if 26 Acquisition did not complete an Initial Business Combination within 24 months from the closing of the offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity;

(iii)     waived its rights to liquidating distributions from the trust account with respect to its Founder Shares if 26 Acquisition failed to complete an Initial Business Combination business combination within 24 months from the closing of the offering; and

(iv)     agreed not to sell any of its Founder Shares or public shares to 26 Acquisition in any tender offer that 26 Acquisition may undertake in connection with a proposed Initial Business Combination.

41.     In addition, 26 Holdings and its officers and directors agreed to vote any Founder Shares held by 26 Holdings in favor of any Initial Business Combination.

42.     As a result of his position as 26 Holdings' Manager, and 26 Holdings' governing documents, Ader had the sole power to vote 26 Holdings' Founder Shares.

43.     Because of the substantial differences between Class A common stock and Class B common stock (Founder Shares), including the fact that Founder Shares are subject to the Lock-Up and lack valuable redemption rights, each share of Class B common stock was and remains substantially less valuable than a share of Class A common stock and will remain so at least until consummation of an Initial Business Combination, if any. If, however, there is no Initial Business Combination, Class B common stock will become worthless, while Class A common stock can be redeemed with funds held in trust for that purpose.

**E.     The IPO.**

44.     On January 20, 2021, 26 Acquisition consummated the IPO of 27,500,000 units at $10.00 per Unit, generating gross proceeds of $275,000,000. Upon information and belief based on 26 Acquisition's public filings, 26 Acquisition placed $275,000,000 ($10.00 per Unit) from the net proceeds of the IPO in a trust account.

45.     Simultaneously with the closing of the IPO, 26 Acquisition consummated the sale of 7,500,000 Private Placement Warrants ("Private Placement Warrants") at a price of $1.00 per Private Placement Warrant in a private placement to 26 Holdings, generating total gross proceeds of $7,500,000.

46.     Upon information and belief, 26 Holdings borrowed the funds that it used to purchase the Private Placement Warrants from SSOF, the Ader-related entity that provided 26 Holdings' initial funding.

11

**F.     The Proposed Business Combination.**

47.     On October 15, 2021, 26 Acquisition entered into an *Agreement and Plan of Merger and Share Acquisition*, as amended ("Merger and Share Acquisition Agreement"), with Tiger Resort Asia Ltd., a Hong Kong private limited company ("TRA"), Tiger Resort, Leisure and Entertainment Inc., a Philippine corporation ("TRLEI"), UE Resorts International, Inc. (formerly Okada Manila International, Inc.), a Philippine corporation ("UERI"), and Project Tiger Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of UERI ("Project Tiger" or "Merger Sub"). (TRA, TRLEI, UERI, and Project Tiger are collectively referred to herein as the "UEC Parties" and the transaction contemplated by the Merger and Share Acquisition Agreement is referred to as the "Proposed De-SPAC.")

48.     Pursuant to the Merger and Share Acquisition Agreement, UERI—the parent of the entity that owns Okada Manila Resort & Casino ("Okada Manila"), a casino-resort in the Philippines—would acquire 26 Acquisition and become a publicly traded company listed on Nasdaq. Upon closing, the stockholders of 26 Acquisition would have the option of either redeeming their shares or becoming stockholders of UERI.

49.     Under the Merger and Share Acquisition Agreement, if consummated, 26 Acquisition would acquire newly issued common shares of UERI through 26 Acquisition's merger with Project Tiger, an entity formed for the express purposes of facilitating the Merger Agreement, and 26 Acquisition would acquire the right to subscribe, on behalf of its shareholders, for common shares of UERI. Non-redeeming shareholders of 26 Acquisition who elect to participate in the transaction would become shareholders of UERI.

**G.     Ader's and SpringOwl's Investment Advice to Rimu.**

50.     In late October 2021, almost immediately after the Merger and Share Acquisition Agreement was signed, and while the Investment Management Agreement between SpringOwl Associates and Rimu remained in effect, Ader and SpringOwl approached MGFO to recommend an investment relating to the Proposed De-SPAC ("Investment Recommendation").

51.     At the time they approached MGFO about the Investment Recommendation, SpringOwl AM and SpringOwl Associates were registered investment advisers. More specifically, SpringOwl AM was a "relying adviser," registered with the SEC on the same Form ADV as SpringOwl Associates – Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers – on the basis that it was "a related adviser under rule 203A-2(b) that controls, is controlled by, or is under common control with, an investment adviser that is registered with the SEC, and your principal office and place of business is the same as the registered adviser."

52.     Ader and SpringOwl made clear to MGFO that any new investment by MGFO related to the Investment Recommendation would be a continuation of the parties' pre-exiting investment-adviser/client relationship and the existing investment adviserfee agreement. This was conveyed by Ader and SpringOwl through, among other things, an offer to "roll our fees from [the Preexisting Investment], currently estimated at around $800,000 into this new deal," so that Rimu would defer payment of investment advisory fees on the Preexisting Investment, and that investment advisory fees owed by Rimu to SpringOwl (and to be paid to Ader-controlled AFM) would be calculated on the basis of combined gains (or losses) of both the Preexisting Investment and the new Investment Recommendation.

53.     On October 22, 2021, Melissa Gannon, SpringOwl's Chief Administrative Officer and Chief of Staff, sent an email to an MGFO Investments Analyst ("MGFO Analyst") stating:

"Please see attached NDA [non-disclosure agreement] for your review for our potential PIPE investors." Alan Leibman ("Leibman"), an outside adviser to MGFO, was copied on the email, along with Ader.

54.     Although not expressly stated in Gannon's email, "PIPE" stands for "private investment in public equity." In a PIPE offering, investors commit to purchase a certain number of restricted shares directly from an issuer company at a specified price.

55.     Consistent with the description in the body of the email that the new investment recommendation was for a PIPE, the NDA attached to SpringOwl's October 22, 2021, email concerned a potential PIPE. The NDA began:

> "As you are aware, Tiger Resort Asia Ltd., Okada Manila International, Inc. ('OMI'), Project Tiger Merger Sub, Inc., Tiger Resort, Leisure and Entertainment, Inc. ('TRLEI') and 26 Capital Acquisition Corp. ('26 Capital') entered into a Merger and Share Acquisition Agreement, dated as of October, 15, 2021 (the 'Merger Agreement'). The Merger Agreement contemplates, among other things, that OMI will register the issuance of certain securities with the U.S. Securities and Exchange Commission (the 'SEC').

> "You have requested information with respect to OMI, TRLEI and 26 Capital (the 'Disclosing Parties') in connection with your consideration of a possible negotiated financing transaction involving you or one of your corporate affiliates and one or more Disclosing Parties (the 'Possible Transaction')."

56.     Thus, the NDA that SpringOwl transmitted to MGFO described only a potential financing transaction involving one or more of: (i) OMI; (ii) TRLEI; or (iii) 26 Acquisition.

57.     The "PIPE" NDA that SpringOwl sent to MGFO made no mention of a potential financing transaction directly with 26 Holdings and did not contemplate the disclosure of information by 26 Holdings or in connection with any investment in 26 Holdings itself.

58.     Moreover, the "PIPE" NDA that SpringOwl sent to MGFO made no mention of a potential sale of membership interests in 26 Holdings that were owned or controlled by Ader or an Ader-related entity.

59.     On October 23, 2021, Leibman replied on the same email chain, but only to MGFO, concerning the subject of the NDA, writing, "Not urgent he want [sic] to share with us a deck on Manila gaming business he is buying. May be interesting to review. I would like to go thru it. We can then see if we think it is an interesting opportunity."

60.     On November 6, 2021, Ader sent an email to MGFO with the subject "26 Capital" and attaching an "Okada Manila Investor Presentation Deck." The email stated, in part:

> "I wanted to summarize the deal we are proposing for [MGFO] as part of 26 Capital's merger/IPO with Okada Manila.
>
> "We view this as a very attractive post pandemic investment in the Asian gaming market.
>
> "We see 300%+ upside in the units and 200%+ upside in the common, before any growth initiatives.
>
> "Attached is an overview of the company.
>
> \* \* \*
>
> "We are proposing [MGFO] make an immediate investment of up to $25,000,000 of common/warrant units @ $10 per unit.
>
> "There is additional capacity of up to $50,000,000 of common only @ $10 per share.
>
> "The units represent 1 share of common and 1 warrant.
>
> "The warrant terms are 5 year duration, 11.50 strike price.
>
> "You can do your own valuation work but a Black Scholes model prices the $1 warrants, based on duration and volatility between $4 and $5.

"Your shares and warrants would be locked up for a year, until 12/31/22, and freely tradeable thereafter on NASDAQ....

"We are targeting a 11/30 closing for the units and have strong demand from our investors. We are very open to having Alan [Leibman] to sit on the board of the company with an investment consistent in size to [MGFO'S] commitments in [earlier investments]."

"Look forward to speaking next week."

61.     Ader's November 6, 2021, email made no mention of a potential investment in 26 Holdings or a purchase of a membership interest in 26 Holdings.

62.     Instead, Ader's November 6, 2021, email proposed an investment in "common/warrant units @ $10 per unit."

63.     Ader's November 6, 2021, email also made no mention of a potential sale of membership interests in 26 Holdings that were owned or controlled by Ader or an Ader-related entity.

64.     Ader's November 6, 2021, email obscured the nature of the Investment Recommendation by referring only to "26 Capital" without distinguishing between 26 Holdings and 26 Acquisition.

65.     Ader's November 6, 2021, email further obscured the nature of the Investment Recommendation by referring only to "common" stock without distinguishing between Class A (publicly traded common stock) and Class B (Founder Shares).

66.     On November 8, 2021, the MGFO Analyst sent an email to Ader, copying Leibman (and others), stating in relevant part:

"In regards to this transaction, who is completing the legal and financial due diligence? Is this something you and your team would undertake as the GP of 26 Capital? And if so, what other

firms/sources are you using to complete the diligence? Are there any outstanding diligence items that remain unanswered?...

"I am working to set up a meeting with Alan [Leibman] to get his thoughts and would like to know more about his involvement through board seats and any currently invested capital."

67.     Later that day, Ader responded, in relevant part:

"Can you speak at 2, 230 or 3p tomorrow?

"We will open up a data room for you asap to review the materials.

"I would call your attention the KPMG, Innovation Group and the Schulte Roth due diligence which cover financial, casino/gaming and legal matters."

68.     On November 18, 2021, Ader conducted a phone call with MGFO to discuss the Investment Recommendation.

69.     Later that day, Ader sent an email to the MGFO Analyst – with the subject "Recap" – which stated:

"Just to recap.

"Ccing Bob Cromwell, who is working on papering this transaction for us.

"[MGFO] is committing to a $25mm investment in 26 Capital units, shares/warrants.

"There will be a 1 year lock up from closing of the business combination with Okada Manila, and then the shares/warrants will be distributed to you directly. After two years, either party can trigger crystallization of fees. Both Alan [Leibman] and I agree to roll our fees from [the Preexisting Investment], currently estimated at around $800,000, into this new deal. Planned funding and closing is 11/30.

"What will the entity be that [MGFO] will be making the investment so we can send you the documents?"

70.     Ader's November 18, 2021, email made no mention of a potential investment in 26 Holdings or a purchase of a membership interest in 26 Holdings.

71.     Instead, the email proposed an investment "in 26 Capital units, shares/warrants."

72.     Ader's November 18, 2021, email also made no mention of a potential sale of membership interests in 26 Holdings that were owned or controlled by Ader or an entity owned or controlled by Ader.

73.     Ader's November 6, 2021, email further obscured the nature of the Investment Recommendation by referring only to "shares" without distinguishing between Class A (publicly traded common stock) and Class B (Founder Shares).

74.     On November 24, 2021, Ader sent an email to the MGFO Analyst, with a copy to Leibman, pressuring MGFO to close the transaction by November 30, 2021, stating in part:

> "Just checking in.
>
> "We had a board meeting with Universal Japan last night and presented Alan [Leibman]'s most impressive bio and resume to them.
>
> "We are looking to close our Okada transaction and funding by 11/30.
>
> "Angela sent over signature pages and documents yesterday.
>
> "Please let me know if you want to discuss anything or have any questions."

75.     Upon information and belief, there was no "Okada transaction" closing "by 11/30" and no legitimate business purpose or deadline that required anyone to close "funding by 11/30."

76.     Upon information and belief, Ader invented the false deadline, which appeared to require closing in a condensed time frame and over the Thanksgiving holiday, to pressure MGFO to transfer $25 million as quickly as possible, in reliance on SpringOwl's and Ader's investment

advice, and to create the false impression that MGFO did not have time to conduct further

investigation into and analysis of the investment that Ader and SpringOwl, as investment advisers

to Rimu, were recommending.

77.     Later that day, the MGFO Analyst replied to Ader, copying Leibman, in part:

"Hi Jason,

"Angela sent over a DocuSign for the subscription agreement…
After reviewing the document, there are multiple references to
outside documents that we are currently not in possession of and that
should be reviewed by myself and the team before the subscription
agreement is executed. Also after reviewing the subscription
agreement, the math is not following to arrive at the purchase price
of $25,000,000, and the purchase price of each unit is $100
compared to the $10 that was previously stated. We understand your
desire to close by 11/30 but please note we have a 3-day capital
movement policy, and this timeline is even more strained with the
holiday this week. In order to get [MGFO] comfortable to sign these
documents without proper diligence on each document as you are
looking to close by 11/30, it will be important that you forward over
a term sheet illustrating your new deal with [MGFO] and include the
calculation of current fees owed along with the rollover and
calculation of future fees. This will help avoid any discrepancies that
may potentially arise in the future and ensure … that there are no
particular clauses within the documents that may pose a risk
throughout the investment and exit timeline. If you have any
questions, I am happy to discuss over a call."

78.     On November 26, 2021, Ader wrote to the MGFO Analyst, coping Leibman, stating

that the investment documents that SpringOwl sent to MGFO included the wrong terms:

"We originally offered [MGFO] $25mm in investment units, priced
at $10, that contain with 1 warrant and 1 common share.

"We will of course honor those terms.

"I am sorry different terms were sent to you in apparent haste, before
the holidays, with Melissa being out.

"We have a pool of other investors who are buying, the less valuable
$100 units with 10/1 shares/units.

"This should not have been set to you and I am sincerely sorry.

"I take the responsibility and hope you forgive me.

"Bob is draft [sic] and will be sending you over the term sheet you requested.

"The accrued fees with Alan are about $800,000 and we plan to roll these fees …into Okada.

"Id [sic] like to talk with you today, what is the best number to reach you at so we can clarify your questions and advance things forward."

79.     Upon information and belief, at the time Ader wrote this email, there was no "pool of other investors who are buying, the less valuable $100 units with 10/1 shares/units" in connection with any transaction with 26 Holdings closing on or about November 30, 2021.

80.     Later that morning, Ader wrote an email to a SpringOwl employee, copying the MGFO Analyst, and stating: "Please recall 26 Capital documents. We have to amend them."

81.     Later that day, Ader sent an email to the MGFO Analyst, copying Leibman, regarding a calculation of investment advisory fees that Ader said were owed to SpringOwl in connection with the Preexisting Investment: "Alan [Leibman] and I would be rolling $800,000 in accrued fees with [MGFO, related to the Preexisting Investment] in[to] the Okada transaction."

82.     Shortly thereafter, also on November 26, 2021, Ader sent an email to the MGFO Analyst with revised documents, including a "Term Sheet & Rollover Agreement" ("Term Sheet"), Subscription Agreement, redline of the Subscription Agreement against the earlier version, and Amended and Restated Operating Agreement for 26 Capital Holdings LLC ("Operating Agreement"). In that email, Ader wrote to the MGFO Analyst, in relevant part:

"Per our discussions, here is the requested Term Sheet and Rollover Agreement and a revised version of the Subscription Agreement for Rimu Capital per our agreement for [MGFO] to purchase $25mm of $10 units. Each unit, as we discussed, and I as originally promised will be made up of 1 common share and 1 warrant.

"The redline shows the revisions to the Subscription Agreement to reflect our agreement.

"I have also attached the Operating Agreement even though there is no change to this document from the one previously sent to you, I wanted to include this again so that the entire document package is provided together (Term Sheet and Rollover Agreement; Subscription Agreement; Operating Agreement)."

83.     On November 30, 2021, Ader sent wire instructions to the MGFO Analyst for the transfer of $25 million in connection with the transaction ("Rimu Transaction"). Ader's wire instructions directed payment of the funds to a SpringOwl bank account held at Bank of America ("1495 Account").

84.     Later that day, the MGFO Analyst sent a message to Ader asking: "[W]hy are we sending the money to SpringOwl Asset Management? It should be going to 26 capital LLC per the subscription agreement, there needs to be an explanation for this intermediate step as it normally should not be there."

85.     Ader responded: "Sorry just seeing this. Was this resolved in our discussion? Or do you need more info."

86.     When the MGFO Analyst wrote back "Need more info," Ader wrote: "Ok. We can do it either way. Whatever [MGFO] prefers." He followed that with: "But I need to track down Bob Cromwell [outside counsel for 26 Holdings]." Four minutes later, Ader sent a photo with account information for an account nicknamed "SO 26 LLC." The account number, however, was for the same SpringOwl bank account, the 1495 Account.

87.     Later that day, Ader emailed wire instructions for what he said was a 26 Capital Holdings "Sub-Account," stating:

"Attached is the wire instructions and information for the sub account you requested.

21

> "We have investors in this deal that have sent funds into the SO 26 LLC X1495 account provided by Bob Cromwell in our executed documents.
>
> "We have no issue accommodating your request to fund into the 26 Capital Holdings LLC subaccount.
>
> "Please call me should you need additional information."

88.    On December 3, 2023, Rimu wired $25 million to the 26 Capital Holdings bank account at Bank of America.

89.    As described below, within days all or substantially all of the $25 million sent by Rimu to 26 Holdings was transferred out of that account as a "distribution" to Ader.

**H.    Ader's Refusal to Provide Information After the Transaction.**

90.    On January 6, 2022, in response to questions from the MGFO Analyst concerning the Rimu Transaction, Ader forwarded an email from Mr. Cromwell, 26 Holdings' outside counsel. The forwarded portion of the email stated:

> "As discussed earlier today, Drew with Rimu Capital asked a question and made a request, and this email responds.
>
> "First, Drew requested a copy of Schedule A, which lists Rimu Capital's Membership Interest in 26 Capital Holdings LLC. When we spoke today, I told you I thought this had already been sent to Rimu Capital in November, but now I checked the redacted version of Schedule A that we had sent out in November, and I see that it was a draft, not a final version. So, I have attached here a redacted final version of Schedule A showing the Rimu Capital Member Interest.
>
> "Second, Drew asked about receiving stock certificates / warrant certificates representing the ownership of the underlying Class B Shares (Founder Shares) and Private Placement Warrants of 26 Capital Acquisition Corp. The Founder Shares and Private Placement Warrants are registered in the name of 26 Capital Holdings LLC, and are not expected to be distributed out to the Members of 26 Capital Holdings LLC until the Lockup Period applicable to these shares and warrants has expired, which will be

some period of time after the Business Combination transaction has been completed.

"I trust the above is responsive to Rimu Capital's request and question."

91.     The redacted "Schedule A" attached to Ader's January 6, 2022, email showed Rimu's Capital contribution of $25,000,000.00, "Number of Founder Shares" as 2,500,000, "Founder Shares Percentage" of 36.36, "Number of Private Placement Warrants" as 2,500,000, and the "Private Placement Warrants Percentage" as 33.33%.

92.     The redacted "Schedule A" attached to Ader's January 6, 2022, email did <u>not</u> show the total capital contribution of all members. That amount was left blank. The draft version of Schedule A provided just prior to closing, approximately one month earlier, showed total capital contributions of members to be $7,525,000.

93.     The redacted "Schedule A" attached to Ader's January 6, 2022, email did <u>not</u> show Rimu's "Residual Percentage."

94.     On June 3, 2022, the MGFO Analyst requested additional information from Ader, asking in an email that Ader provide:

- Full detailed summary/history of the current situation and details (amounts owned) of every party involved.

- Dates of voting meeting and planned governmental change.

- Potential rectifications and expert advice from all advisors including boards, local, and international counsel along with a summary of the current Philippine government situation.

- Full Cap Table for 26 Capital and the sponsoring Holdco company.

- Entity structure diagram with detailed breakouts of the amount owned by each party (i.e. how does Universal fit in

with UERI, TRELI, Okada Manila, TRAL, 26 Capital, 26 capital holding entity)

- Financials from 2021 – present

- Movement of money and where the money is currently.

- Current options and the various outcomes of each option along with a decision hierarchy tree diagram.

95.     Two days later, on June 5, 2022, Ader responded in an email. He began by writing: "Alan and I will discuss as we have shared 50/50 economics with [MGFO] in the past and rolled our shared economics from [the Preexisting Investment] into this deal."

96.     In his June 5, 2022, email, Ader refused to provide information concerning the members of 26 Holdings, writing: "You requested a full cap table for 26 Capital and the sponsoring Holdco company. We will provide a copy of the publicly available ownership information for 26 Capital Acquisition Corp. The full ownership table of 26 Capital Holdings LLC is private information that we do not share."

97.     In his June 5, 2022, email, Ader refused to provide financial information for 26 Holdings: "You requested financials from 2021 to present. We can put together the publicly available information with respect to 26 Capital Acquisition Corp. and UERI. For 26 Capital Holdings, we provide to each Member the tax filing information relevant to each Member."

98.     With respect to the request concerning "movement of money and where the money is currently," Ader claimed to "not understand what is being requested here" and asked "[w]hat money and company does this refer to?"

99.     Thereafter, Ader responded to requests for information by providing only publicly filed documents, media reports, and information previously provided to Rimu, including copies of the Term Sheet, Subscription Agreement, and Investor Presentation.

100.    On July 5, 2022, Rimu made a formal demand on Ader, as the Managing Member of 26 Holdings, to inspect its books and records under its Operating Agreement and Delaware law.

101.    In response, Ader refused to provide meaningful information concerning 26 Holdings, other than to provide: (i) a redacted schedule of membership interests that showed only Rimu's capital contribution, Number of Founder Shares, Founder Shares Percentage, and Number of Private Placement Warrants (all of which was previously disclosed to Rimu); and (ii) a heavily redacted balance sheet, which concealed the identities, capital contributions and total capital of the other members.

### I.  Fact Disclosures in the Delaware Action Revealed that Ader and SpringOwl Defrauded Rimu and that Ader Secretly Distributed Rimu's $25 Million Capital Contribution to Himself.

102.    After delays in consummating the Proposed De-SPAC, on February 2, 2023, 26 Acquisition commenced an action against the UEC Parties ("Delaware Action") by filing a complaint in the Delaware Court of Chancery. In the Delaware Action, 26 Acquisition seeks a grant of specific performance ordering the UEC Parties to specifically perform their obligations under the Merger and Share Acquisition Agreement, including using reasonable best efforts to consummate the Proposed De-SPAC in accordance with the terms of the Merger and Share Acquisition Agreement.

103.    Public filings in the Delaware Action revealed significant facts that Ader, SpringOwl, and 26 Holdings did not previously disclose to Rimu, either before or after the closing of the Rimu Transaction. Among the revelations were:

### (a)  Revelations Concerning Ader's Self-Dealing from the Rimu Transaction.

104.    Through the Rimu Transaction, Ader transferred his own interests 26 Holdings.

105.    Through Rimu Transaction, Ader divested himself of all or substantially all of his then-remaining economic interests in Founder Shares and Private Placement Warrants.

106.    At no time in making the Investment Recommendation or prior to the closing of the Rimu Transaction did Ader, SpringOwl, or 26 Holdings disclose to Rimu the fact that Ader was transferring his own interests in 26 Holdings, representing an economic interest in Founder Shares and Private Placement Warrants, to Rimu.

**(b)     Revelations Concerning the Zama Subscription Agreement.**

107.    In a subscription agreement dated July 12, 2021 ("Zama Subscription Agreement"), *i.e.,* before the Investment Recommendation or the Rimu Transaction, Zama Capital Master Fund, LP, acquired an economic interest in 4 million Founder Shares held by 26 Holdings, more than 58% of the total, as well as an economic interest in 4.5 million Private Placement Warrants held by 26 Holdings (60% of the total) for $4.5 million. This was a fraction of the amount that Rimu paid ($25 million) for a much smaller economic interest (2.5 million Founder Shares and 2.5 million Private Placement Warrants).

108.    Upon information and belief, the $4.5 million paid by Zama for an economic interest in 26 Holdings was paid not to 26 Holdings, but instead to Ader affiliate SSOF.

109.    At no time in making the Investment Recommendation or prior to the closing of Rimu Transaction did Ader, SpringOwl, or 26 Holdings disclose to Rimu the existence of the Zama Subscription Agreement.

110.    The Zama Subscription Agreement was significant for several reasons. Among those are that, in February 2021, UEC and Zama LP, an entity related to Zama Capital Master Fund, LP, executed an engagement letter through which Zama LP agreed to act as an adviser assisting UEC in evaluating potential counterparties to a transaction with UEC, including SPACs.

111.    In the Delaware Action the UEC Parties have alleged that Zama entities under common control were on both sides of the proposed De-SPAC, both advising the UEC Parties and, secretly, holding an interest in 26 Holdings and working with Ader to close the De-SPAC transaction. Characterizing these allegations of Zama working both sides, Vice Chancellor J. Travis Laster wrote that "Zama is alleged to have engaged in what at first blush appears to be extreme and facially problematic behavior."

112.    The Zama Subscription Agreement also is significant because, through that agreement, Ader and 26 Holdings granted to Zama an economic interest Founder Shares and Private Placement Warrants at a substantially lower valuation than the economic interests offered to Rimu. Ader and SpringOwl never disclosed to Rimu that, only shortly before they made the Investment Recommendation, Ader had engaged in that transaction with Zama on far more advantageous terms to Zama than Ader and SpringOwl were recommending to Rimu.

113.    Rimu has since learned that, pursuant to the Zama Subscription Agreement, Ader, as Managing Member of 26 Holdings, altered the distribution provisions of the Operating Agreement to provide that certain distributions would be made to Zama ahead of pro rata distributions to other members, including Rimu ("Zama Distribution Provision"). Pursuant to the Zama Subscription Agreement, Ader and 26 Holdings specifically agreed that the Zama Distribution Provision "shall supersede any distribution provisions to the contrary set forth in the operating agreement." Thus, the Zama Distribution Provision was contrary to the provisions of the Operating Agreement that was provided to Rimu. At no time in making the Investment Recommendation or prior to the closing of the Rimu Transaction did Ader, SpringOwl, or 26 Holdings disclose to Rimu the existence of the Zama Distribution Provision or any other alteration of the distribution provisions of the Operating Agreement.

    **(c)**    **Revelations Concerning Ader's Personal Windfall from the Rimu Transaction.**

114.    Having orchestrated the transfer by Rimu of $25 million to 26 Holdings' bank account, Ader wasted no time in transferring that money – and more – to himself.

115.    On or about December 9, 2021, Ader transferred $4.5 million – representing the amount paid by Zama to SSOF in connection with the Zama Subscription Agreement – into 26 Holdings' bank account with Bank of America.

116.    On or about December 10, 2021, Ader authorized a distribution and actually distributed $28 million from 26 Holdings' bank account to himself or an entity that he controls ("Personal Ader Distribution")."

117.    This represented an enormous windfall for Ader. 26 Holdings had acquired all of the Founder Shares for a total of only $25,000 and all of the Private Placement Warrants for a total of $7.5 million, all of which had been borrowed from SSOF and which, upon information and belief, is still owed by 26 Holdings to SSOF as "loans." The Ader Distribution, therefore, is entirely profit to Ader.

    **J.**    **Ader's Obfuscations Concerning Leibman's Interest in the Investment Recommendation.**

118.    As explained above, Leibman had a preexisting advisory relationship with MGFO and Plaintiff.

119.    Leibman's October 23, 2021, email to MGFO, in response to SpringOwl sending the PIPE NDA, said: "[Ader wanted] "to share with us a deck on Manila gaming business he is buying. May be interesting to review. I would like to go thru it. We can then see if we think it is an interesting opportunity." Leibman's email suggested that he would be advising MGFO and Rimu on whether the investment made sense for Rimu.

120.    Ader's November 6, 2021, email to MGFO in which he summarized the Investment Recommendation stated, in part: "We are very open to having Alan [Leibman] to sit on the board of the company with an investment consistent in size to [MGFO'S] commitments in [earlier investments]." Ader's Investment Recommendation, therefore, expressly stated that MGFO's investment could be accompanied by the right to have Leibman serve on the board of the company, presumably as Rimu's designee.

121.    On February 9, 2023, Ader sent an email to MGFO in which he said, in part: "As you may know, I have been giving Alan Leibman, *my partner on this investment with you*, regular updates on Okada Manila." (Emphasis added.) This was the first time that Ader referred to Leibman as his "partner on this investment."

122.    In an email response the next day, February 10, 2023, MGFO's in-house legal adviser wrote to Ader: "With respect to Alan Leibman, to what extent was Alan your partner on this investment? Please elaborate on Alan's involvement and whether he was compensated. Alan has told us he was not involved."

123.    Later that day, February 10, 2023, Ader responded in part: "I would like to provide clarification regarding Alan and his company's contract with my firm. Our agreement pertains solely to [MGFO's] investments with me. Alan is entitled to 50% of any economics I earn according to the contract."

124.    This was the first time that Ader disclosed that Leibman was a party to a contract with Ader or SpringOwl pursuant to which Leibman is "entitled to 50% of any economics I earn according to the contract."

125.    On March 13, 2023, Ader sent an email to MGFO, stating:

"I am writing to provide important clarification regarding Alan Leibman's ownership of 26 Capital Acquisition Corp and SpringOwl Asset Management.

"Earlier today, Alan Leibman called me and requested that I communicate to you in writing that he does not own half of either entity. Therefore, I am sending this email to ensure that this message is conveyed to you clearly and accurately, as it is essential information that may have previously been misunderstood".

126.    Ader has consistently, continuing through the date of this Complaint, refused MGFO's / Rimu's requests for a copy of the contract with Leibman.

## V.    Material Misstatements and Omissions.

### A.    Material Misrepresentations and Omissions Concerning Ader's Ownership of the Membership Interest Being Transferred to Rimu.

127.    As set forth above, Ader and SpringOwl made material misstatements, and omitted material information, concerning the fact that Ader was transferring his own personal interest in 26 Holdings to Rimu.

128.    In all the communications from Ader and SpringOwl to Rimu, as alleged more fully above, Ader and SpringOwl never disclosed that the Investment Recommendation contemplated that Ader would transfer his own interests in 26 Holdings, representing an economic interest in Founder Shares and Private Placement Warrants.

129.    The Subscription Agreement states that "[t]he Transfer [of the Membership Interest to Rimu] shall be effected in accordance with the provisions of Section 8.04 of the Operating Agreement." Section 8.04 of the Operating Agreement provides that, "Underlying Interests in a Security shall be deemed Transferred from all applicable holders thereof pro rata in accordance with the relevant percentage(s) to which such Underlying Interests in a Security relate." Section 8.04 of 26 Holdings' Operating Agreement further provides that "Notwithstanding the foregoing,

the Managing Member (except as otherwise set forth in a Subscription or Grant Agreement) may determine in its sole discretion that certain holders of a percentage in an Underlying Interest in a Security shall not be deemed to transfer any Underlying Interests in a Security to a transferee." Upon information and belief, Ader, as 26 Holdings' Managing Member, invoked this provision to determine that all other members of 26 Holdings, other than himself, would "not be deemed to transfer any Underlying Interests" to Rimu in connection with the Subscription Agreement. Ader and SpringOwl, however, never disclosed to Rimu that Ader planned to, or did, allocate 100% of the Units from his own personal stake in 26 Holdings.

130.    The fact that Ader was cashing out his personal stake in 26 Holdings and his associated financial interest in Founder Shares and Private Placement Warrants at the same time that he was recommending that Rimu purchase those interests was material because any reasonable investor would have wanted to know of its investment adviser's desire to exit the investment just as the investment adviser was recommending the purchase.

**B.    Material Misrepresentations and Omissions Concerning Ader's, SpringOwl's, and AFM's Financial Interest in the Investment Recommendation.**

131.    Ader and SpringOwl misrepresented material facts and omitted material facts concerning the manner and extent to which Ader, SpringOwl AM, and AFM would profit from the Investment Recommendation.

132.    Ader and SpringOwl presented the Investment Recommendation as one in which they would "roll [their] fees from [the Preexisting Investment], currently estimated at around $800,000 into this new deal" so that Rimu would defer payment of investment advisory fees on the Preexisting Investment, and that investment advisory fees owed by Rimu to SpringOwl AM

(and to be paid to Ader-controlled AFM) would be calculated on the basis of combined gains (or losses) of both the Preexisting Investment and the new investment recommendation.

133.    In doing so, Ader and SpringOwl presented the Investment Recommendation as one in which Ader, SpringOwl AM (under Ader's control) and AFM (under Ader's control) would profit from the Investment Recommendation solely from investment advisory fees consistent with the parties' preexisting and ongoing investment advisory relationship and the formula set forth in the writing by Ader and SpringOwl.

134.    Those statements by Ader and SpringOwl were false and misleading because, rather than profiting solely from investment advisory fees based on an increase in the value of underlying securities, Ader, as Manager of 26 Holdings, intended to, and actually did, profit from the Investment Recommendation by immediately self-authorizing a distribution solely to himself and transferring to himself $28 million, including all or substantially all of Rimu's investment.

135.    Ader and SpringOwl never disclosed to Rimu that Ader would profit from the Investment Recommendation other than through the advisory fees disclosed to Rimu.

136.    Ader's and SpringOwl's omission of any disclosure of profits that Ader would earn on the sale of his own personal interest in 26 Holdings, and his intent to take a personal distribution of $28 million from 26 Holdings, rendered their description of the investment advisory fees connection with the Investment Recommendation false and misleading.

137.    Full disclosure of Ader's personal interest in, and intended financial windfall from, the Investment Recommendation was necessary in order to make the statements made (concerning the fees to be charged to Rimu), in light of the circumstances in which they were made, not misleading.

138.    The foregoing misrepresentations and omissions were material because any reasonable investor would have wanted to know the investment adviser's financial incentive to recommend the investment in order assess whether the recommendation was tainted by self-interest and self-dealing, as the Investment Recommendation was.

**C.      Material Misrepresentations and Omissions Concerning Ader's Conflict of Interest.**

139.    Ader and SpringOwl also misrepresented and omitted material facts concerning Ader's and SpringOwl's inherent conflict of interest in the Investment Recommendation:

140.    Ader's and SpringOwl's descriptions of the fee structure falsely represented that Ader's and SpringOwl's economic interests in the Investment Recommendation were aligned with Rimu's economic interests because Ader and SpringOwl would, under the proposed fee structure, only profit from the Investment Recommendation if the value of the underlying securities increased.

141.    Those representations were false and misleading because Ader had a direct and undisclosed conflict of interest in the Investment Recommendation because he stood to, and actually did, make a windfall profit immediately by transferring his own personal stake in 26 Holdings to Rimu and taking a $28 million personal distribution from 26 Holdings using the funds that Ader and SpringOwl fraudulently induced Rimu to transfer to 26 Holdings.

142.    Ader's and SpringOwl's omissions concerning Ader's personal interest in the Investment Recommendation made the statements actually made concerning the fee structure, in light of the circumstances in which they were made, misleading as to the apparent alignment – but actual misalignment – of the parties' economic interests in the Investment Recommendation.

143.    The foregoing misrepresentations and omissions were material because any reasonable investor would have wanted to know that the investment adviserrecommending a particular investment would, if the transaction closed, reap a huge profit regardless of whether the investment increased or decreased in value over time.

**D.    Material Misrepresentations and Omissions Concerning the False Closing Date and "Strong Demand" from "Other Investors."**

144.    Ader's November 6, 2021, statement that "we are targeting a 11/30 closing for the units and have strong demand from our investors" was materially false and misleading.

145.    At the time of that email, Ader knew that there were no other investors in the proposed purchase of membership interests in 26 Holdings, or Founder Shares or Private Placement Warrants, let alone "strong demand from our investors" for the purchase of membership interests in 26 Holdings.

146.    Instead, Ader targeted MGFO alone and deceitfully attempted to make the investment appear attractive by referring to non-existent "strong demand from our investors."

147.    Ader's first November 26, 2021, statement that "[w]e have a pool of other investors who are buying, the less valuable $100 units with 10/1 shares/units" was materially false and misleading.

148.    Upon information and belief, at the time the statement was made, there was no "pool of investors" buying any interest in 26 Holdings, let alone any "pool of investors" buying "less valuable $100 units with 10/1 shares/units."

149.    Upon information and belief, Ader fabricated the "pool of investors" allegedly interested in a "less valuable" investment to create false impressions of both high demand and desirability when, in fact, there was none.

150.    Ader had actual knowledge that these statements were false because, as 26 Holdings' Manager and the individual who controlled all the relevant entities, he was fully aware of all such transactions – and the fact that there were none.

151.    Ader's November 30, 2021, email concerning the account that would receive the funds from Rimu also was materially false and misleading. In justifying his instructions that Rimu should wire $25 million directly to SpringOwl, rather than 26 Holdings, Ader stated: "We have investors in this deal that have sent funds into the SO 26 LLC X1495 account provided by Bob Cromwell in our executed documents." Ader's statement was materially false and misleading because there were no other "investors in this deal," let alone "investors in this deal that have sent funds into the SO 26 LLC X1495 account." Ader knew this statement was materially false and misleading because, as 26 Holdings' Manager, he was aware of all such transactions and the fact that there were none. Upon information and belief, Ader made this false statement to create the false impression of high demand and desirability when, in fact, there was none.

152.    The foregoing misrepresentations and omissions were material because any reasonable investor would have wanted accurate information concerning any legitimate time pressure to close a transaction, as well as truthful information concerning whether there were other investors in the same investment.

**E.      Material Omissions Concerning the Zama Subscription Agreement, Zama Distribution Provision, and the Zama's Relationship with the UEC Parties.**

153.    Ader and SpringOwl also failed to disclose to Rimu material facts concerning Zama.

154.    Ader and SpringOwl failed to disclose that, shortly before Ader and SpringOwl made the Investment Recommendation, Zama received an interest in Founder Shares and Private

Placement Warrants at a far more favorable price than Ader and SpringOwl recommended to Rimu, and on which the Rimu Transaction ultimately closed.

155.    Ader and SpringOwl also failed to disclose that, shortly before Ader and SpringOwl made the Investment Recommendation, Ader agreed to the Zama Distribution Provision, in which Zama received a distribution priority that altered the Operating Agreement in a way that gave preferential treatment to Zama and, in so doing, diluted the value of the economic interest being transferred to Rimu.

156.    In connection with the Investment Recommendation, Ader and SpringOwl provided Rimu with a copy of the Operating Agreement but did not inform Rimu that the Operating Agreement had been materially altered by the Zama Distribution Provision.

157.    The failure to disclose the fact that the Operating Agreement had been materially altered by the Zama Distribution Provision was materially false and misleading.

158.    The foregoing misrepresentations and omissions were material because any reasonable investor would have wanted to know that its registered investment adviser recently closed an investment in the same entity at a dramatically lower valuation and with an undisclosed distribution preference.

159.    Ader and SpringOwl also failed to disclose Zama's relationship with the UEC Parties, and the fact that Zama did not disclose to the UEC Parties that Zama had an interest in 26 Holdings. This omission was material because Zama's dual interest in the Proposed De-SPAC threated to, and now has, provided the UEC Parties with a reason to try to prevent the closing of the Proposed De-SPAC, which would render Rimu's interest in 26 Holdings worthless.

**F.      Material Omissions Concerning Transaction Delays.**

160.    As alleged in 26 Acquisition's Answer to Counterclaims in the Delaware Action, Ader claims that there were "various delays and failures by [the UEC Parties] to work with [26 Acquisition], including the failure to file a preliminary Form F-4 before February 23, 2022."

161.    Ader and SpringOwl did not disclose to Rimu that, at the time of the Investment Recommendation and the closing of the Rimu Transaction, there were "various delays and failures by [the UEC Parties] to work with [26 Acquisition], including the failure to file a preliminary Form F-4."

162.    Such undisclosed delays posed a material risk that the transaction would not close, and that Founder Shares would be locked up longer than the period in the representations made by Ader and SpringOwl or rendered worthless.

163.    SpringOwl and Ader, however, did not disclose either the fact or the potential risk of such delays to Rimu.

164.    Instead, Ader offloaded all or substantially all of his personal risk due to such delays to Rimu without disclosing that Risk to Rimu.

165.    The forgoing omissions were material because any reasonable investor would have wanted to know there was a risk of the merger transaction not closing and, as a result, the underlying securities becoming worthless. In addition, merger delays ran the risk that the underlying securities would be subject to "lock up" for a longer period than Ader and SpringOwl disclosed.

**G.      Material Omissions Concerning Leibman.**

166.    Ader and/or SpringOwl had a contract with Leibman, which Ader and SpringOwl have still refused to provide to Rimu.

167.    Upon information and belief, under the undisclosed contract with Leibman, who appeared to be advising Rimu, Leibman was entitled to 50% of the fees earned by Ader from any transaction with MGFO.

168.    The forgoing omissions were material because any reasonable investor would have wanted to know that Leibman, in advising Rimu, had a contract with the investment adviserwho was making the Investment Recommendation.

169.    All of foregoing statements and omissions described in the preceding paragraphs were material because, individually and collectively, they would have been viewed by Rimu, and by any reasonable investor, as having significantly altered the total mix of information made available in connection with the Investment Recommendation.

**H.    Scienter.**

170.    Ader and SpringOwl acted with intent to deceive, manipulate, and defraud Rimu.

171.    Ader had the motive to defraud Rimu because, in so doing, he was able to withdraw all or substantially all of Rimu's $25 million investment from 26 Holdings for his own personal benefit.

172.    Ader had the opportunity to defraud Rimu. As set forth above, he had the opportunity to:

  a.    affirmatively bring the potential investment to the attention of Rimu and recommend the investment;

  b.    draw upon his and SpringOwl's preexisting investment advisory relationship and special relationship of trust and confidence to induce Rimu to rely upon him and SpringOwl to recommend appropriate investments;

c.     transfer his own personal economic interest in Founders Share and Private Placement Warrants;

d.     conceal from Rimu the fact that he was transferring his own personal economic interest in Founder Shares and Private Placement Warrants;

e.     fraudulently distribute all or substantially all of the funds that Rimu sent to 26 Holdings to himself; and

f.     conceal the distribution of all or substantially all of the funds that Rimu sent to 26 Holdings to himself.

173.   Ader's and SpringOwl's scienter also can be inferred from their false, obfuscating, and intentionally misleading statements leading up to the Rimu Transaction, which concealed Ader's personal financial interest in the transaction.

174.   Ader's and SpringOwl's scienter also can be inferred from the fact that, when MGFO asked who would be performing due diligence on the Investment Recommendation, Ader did not correct MGFO's misunderstandings and led MGFO to believe that Ader and SpringOwl had retained professionals to evaluate the Investment Recommendation.

175.   Ader's and SpringOwl's scienter can be inferred from these facts because they provide strong evidence of conscious misbehavior by Ader and SpringOwl: each knew the true facts and had access to information showing that these statements were false for the reasons described.

176.   Ader's and SpringOwl's scienter also can be inferred from their obfuscating and intentionally misleading statements following the closing of the Rimu Transaction, which continued to conceal Ader's personal financial interest in the Rimu Transaction and his sale of his own personal interest in 26 Holdings.

177.    Ader's scienter can be inferred from these facts because they provide strong evidence of conscious misbehavior by Ader, 26 Capital's Manager, who was actively concealing relevant financial information from Rimu, a member of 26 Holdings, when that information would have disclosed Ader's conflicts of interest and self-dealing.

178.    Ader's knowledge and scienter can be imputed to SpringOwl AM because at all relevant times, SpringOwl AM was owned and controlled by Ader Investment Management, LLC, which was wholly owned by Ader.

179.    Ader's knowledge and scienter can be imputed to SpringOwl Associates because SpringOwl AM was the sole member of, and had control over, SpringOwl Associates.

180.    Ader's knowledge and scienter can be imputed to 26 Holdings because Ader had the sole power to control 26 Holdings.

**I.    Reasonable Reliance.**

181.    Rimu had a preexisting investment advisory relationship with Ader and SpringOwl that created a special relationship of trust and confidence and a fiduciary duty on the part of Ader and SpringOwl.

182.    In addition, at all relevant times, SpringOwl AM and SpringOwl Associates were registered investment advisers and investment advisers within the meaning of the Investment Advisers Act. The Investment Advisers Act imposes on investment advisers an obligation to act in the best interests of its advisory client and an adviser may benefit from a transaction recommended to a client if, and only if, that benefit, and all related details of the transaction are fully disclosed.

183.    Moreover, as explained above, when the MGFO Analyst asked Ader if due diligence on the Investment Recommendation was "something you and your team would undertake

as the GP of 26 Capital?," Ader's response ("I would call your attention the KPMG, Innovation Group and the Schulte Roth due diligence which cover financial, casino/gaming and legal matters.") suggested that, at Ader's and SpringOwl's request, extensive due diligence concerning the Investment Recommendation had already been undertaken by those professionals.

184.    Under the circumstances, Rimu reasonably relied upon its investment advisers, Ader and SpringOwl, to: (i) provide truthful information concerning the investments that they recommended to Rimu; (ii) not withhold material information concerning the investments that they proposed for Rimu; and (iii) not engage in transactions with Rimu in which they had undisclosed conflicts of interest.

### J.    Damages.

185.    Rimu would not have entered into the Rimu Transaction but for the material misstatements and omissions described above.

186.    The defendants' material misstatements and omissions have damaged Rimu by fraudulently inducing it to pay $25 million in exchange for a membership interest in 26 Holdings that is either entirely worthless or worth substantially less than that amount.

**FIRST CAUSE OF ACTION**
**For Rescission Under the Investment Advisers Act**
**15 U.S.C. § 80b-6**
**(Against Ader, SpringOwl, and AFM)**

187.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

188.    Ader and SpringOwl each acted as an investment adviser to Rimu in connection with the investments described herein, including the Preexisting Investment and the Rimu Transaction.

189.    The Investment Management Agreement, as amended by the Term Sheet, were written investment advisory agreements setting forth, among other things, the compensation to be paid for Ader and SpringOwl to provide investment adviser services to Rimu.

190.    Section 206 of the Investment Advisers Act provides that it shall be unlawful for any investment adviser:

> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
>
> . . . .; or
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6(2)-(4).

191.    As set forth above, Ader and SpringOwl engaged in a "transaction, practice, or course of business which operate[d] as a fraud or deceit" upon Rimu in violation of 15 U.S.C. § 80b-6(2).

192.    As set forth above, Ader and SpringOwl engaged in acts, practices, and a course of business which is fraudulent, deceptive, or manipulative in violation of 15 U.S.C. § 80b-6(4).

193.    All contracts made in violation of the Investment Advisers Act are void. 15 U.S.C. § 80b-15.

194.    By virtue of the foregoing, Rimu is entitled to rescission of the Investment Management Contract, the Term Sheet, and all other contracts whether written or oral that purport to entitle Ader, SpringOwl AM, SpringOwl Associates, AFM or any other Ader-related entities to fees and other consideration in connection with the Preexisting Investment or the Rimu Transaction and the return of all consideration paid in connection with those contracts.

## SECOND CAUSE OF ACTION
### For Rescission Based on Fraudulent Inducement
### (Against Ader, SpringOwl, and AFM)

195.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

196.    Ader, SpringOwl, and AFM fraudulently induced Rimu to enter into the Investment Management Contract and the Term Sheet by making materially false statements and omitting material facts.

197.    Rimu reasonably relied upon its investment advisers, Ader and SpringOwl, to: (i) provide truthful information concerning their personal financial interests in the investments that they recommended to Rimu; (ii) not withhold material information concerning their personal financial interests in the investments that they recommended to Rimu; and (iii) not engage in transactions with Rimu in which they had undisclosed conflicts of interest.

198.    Rimu would not have entered into the Investment Management Contract and the Term Sheet but for the material misstatements and omissions described above.

199.    The defendants' material misstatements and omissions have damaged Rimu.

200.    By virtue of the foregoing, Rimu is entitled to rescission of the Investment Management Contract and the Term Sheet on the grounds that Ader and SpringOwl fraudulently induced Rimu to enter into those agreements.

## THIRD CAUSE OF ACTION
### Fraud and Fraudulent Inducement
### (Against Ader, SpringOwl, and 26 Holdings)

201.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

202.    As set forth above, Ader and SpringOwl falsely represented material facts and omitted material facts that they had a duty to disclose.

203.    As set forth above, Ader and SpringOwl knew or believed that the representations were false or made those representations with a reckless indifference to the truth.

204.    As set forth above, Ader and SpringOwl intended to induce Rimu to rely on their representations and omissions, to refrain from further investigation, and to consummate in the Rimu Transaction.

205.    Rimu was damaged by its reliance on Ader's and SpringOwl's misrepresentations and omissions.

206.    Ader's knowledge and intent to defraud Rimu, as Manager of 26 Holdings, is properly imputed to 26 Holdings.

207.    By virtue of the foregoing, Rimu is entitled to rescission of the Rimu Transaction and/or an award of damages against Ader, SpringOwl, and 26 Capital in an amount to be determined at trial but reasonably believed to be $25 million plus interest.

### FOURTH CAUSE OF ACTION
### Constructive Fraud
### (Against Ader and SpringOwl)

208.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

209.    By virtue of the investment advisory relationship between Rimu and Ader and SpringOwl, Defendants Ader and SpringOwl owed a fiduciary duty to Rimu and there was a special relationship of trust and confidence between Rimu and those defendants.

210.    As set forth above, Defendants Ader and SpringOwl falsely represented facts and omitted facts that they had a duty to disclose.

211.    As set forth above, Defendants Ader and SpringOwl intended to induce Rimu to rely on their representations and omissions, to refrain from further investigation, and to engage in the Rimu Transaction.

212.    Rimu was damaged by its reliance on the misrepresentations and omissions of Ader and SpringOwl in an amount to be determined at trial.

213.    By virtue of the foregoing, Rimu is entitled to an award of damages against Ader and SpringOwl in an amount to be determined at trial but reasonably believed to be $25 million plus interest.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Against Ader and SpringOwl)**

214.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

215.    By virtue of the investment advisory relationship between Rimu and Ader and SpringOwl, Defendants Ader and SpringOwl owed a fiduciary duty to Rimu and there was a special relationship of trust and confidence between Rimu and those defendants.

216.    As set forth above, Defendants Ader and SpringOwl falsely represented facts and omitted facts that they had a duty to disclose.

217.    As set forth above, Defendants Ader and SpringOwl intended to induce Rimu to rely on their representations and omissions, and to refrain from further investigation, and to engage in the Rimu Transaction.

218.    Rimu was damaged by its reliance on the misrepresentations and omissions of Ader and SpringOwl in an amount to be determined at trial.

219.    By virtue of the foregoing, Rimu is entitled to an award of damages against Ader and SpringOwl in an amount to be determined at trial but reasonably believed to be $25 million plus interest.

### SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty as Investment Advisers
### (Against Ader and SpringOwl)

220.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

221.    As investment advisers, Ader and SpringOwl had a fiduciary duty to Rimu to: (i) provide truthful information concerning the investments that they recommended to Rimu; (ii) not withhold material information concerning the investments that they proposed for Rimu; and (iii) not engage in transactions with Rimu in which they had undisclosed conflicts of interest.

222.    Ader and SpringOwl breached these duties by recommending to Rimu that it engage in the Rimu Transaction without disclosing all material information and without disclosing their conflicts of interest.

223.    In addition, Ader and SpringOwl had a duty to act in the best interests of Rimu. Ader and SpringOwl breached this duty by recommending that Rimu engage in the Rimu Transaction when other investments, including those related to the SPAC and De-SPAC, would have been more financially advantageous to Rimu. Among the options available were:

　　　　　　　a.    Rimu could have acquired publicly traded Class A common stock warrants in 26 Acquisition for a price at or near the price it paid for an indirect interest in less desirable, less valuable Class B common stock (Founder Shares) and Private Placement Warrants. Had Ader and SpringOwl advised Rimu to do so, SpringOwl would have acquired Class A stock with redemption rights

and no "lock-up" and with no risk that the investment would be entirely lost in the event the De-SPAC failed to close.

b.  Ader could have introduced Rimu as a potential PIPE investor and facilitated a direct investment by Rimu. In such a scenario, an "anchor" investor such as Rimu would expect to acquire a significant block of equity at a discount to the publicly traded shares.

224.    Either of those scenarios would have placed Rimu in a substantially better financial position but would have deprived Ader of the undisclosed windfall profit on the sale to Rimu of his personal interest in 26 Holdings. The only reason for Ader and SpringOwl to make the Investment Recommendation instead of advising Rimu to invest through either of those two options, or to make other comparable investments, was for Ader to personally profit from the Rimu Transaction.

225.    By reason of the foregoing, Ader and SpringOwl breached their fiduciary duties to Rimu.

226.    By reason of the foregoing, Rimu was damaged because in the Rimu Transaction, it acquired only a membership interest in a limited liability company associated with an indirect economic interest in less valuable securities rather than a direct interest in more valuable securities.

227.    By virtue of the foregoing, Rimu is entitled to an award of damages against Ader and SpringOwl in an amount to be determined at trial but reasonably believed to be $25 million plus interest.

## SEVENTH CAUSE OF ACTION
### Breach of Operating Agreement
### (Against Ader)

228.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing

paragraphs as if fully set forth herein.

229.    Pursuant to the terms of the Operating Agreement, distributions may only be made

in proportion to the members' percentage interests:

> (i) Distributions attributable to the Founder Shares shall be made pro rata to each Member in accordance with his, her or its Founder Shares Percentage;

> (ii) Distributions attributable to the Private Placement Warrants shall be made pro rata to each Member in accordance with his, her or its Private Placement Warrants Percentage;

> (iii) Distributions attributable to the Loan Warrants shall be made pro rata to each Member in accordance with his, her or its Loan Warrants Percentage and

> (iii) [sic] All other distributions shall be made pro rata to each Member in accordance with his, her or its Residual Percentage.

Operating Agreement at § 4.01(a).

230.    The Ader Distribution was not a distribution "attributable to the Founder Shares"

under § 4.01(a)(i), or "attributable to the Private Placement Warrants" under § 4.01(a)(ii), or

"attributable to the Loan Warrants" under § 4.01(a)(iii), and therefore was an "other distribution[]"

within the meaning of § 4.01(a) that, under the Operating Agreement, must "be made pro rata to

each Member in accordance with his, her or its Residual Percentage."

231.    The Ader Distribution was made by Ader, the Manager of 26 Holdings, in violation

of Section 4.01(a) of the Operating Agreement, because the Ader Distribution was not "pro rata to

each Member in accordance with his, her or its Residual Percentage."

232.    Pursuant to the terms of the Operating Agreement, "'Residual Percentage' means the percentage interest attributable to a Member's residual interest in the Company as set forth on Schedule A, as amended from time to time, *representing such Member's proportionate Capital Contribution*." (Emphasis added.)

233.    As of December 2021, when Ader authorized and took the Ader Distribution, total Capital Contributions were approximately $32,275,000.

234.    As of December 2021, when Ader authorized and took the Ader Distribution, Rimu had made a Capital Contribution of $25 million, representing more than 77% of the total.

235.    As of December 2021, when Ader authorized and took the Ader Distribution, Zama's capital in 26 Holdings was $4.5 million representing almost 14% of the total.

236.    As result, as of December 2021, when Ader authorized and took the Ader Distribution, the Capital Contributions of all other Members, including Ader, amounted to less than 9% of the total.

237.    Nevertheless, as Manager of 26 Holdings, Ader fixed his own Residual Percentage "*representing such Member's proportionate Capital Contribution*," at 100% and the Residual Percentage of every other member at 0%.

238.    Ader breached the Operating Agreement by falsely and fraudulently setting the Member's Residual Percentage such that it does not "represent[] such Member's proportionate Capital Contribution."

239.    Having falsely and fraudulently fixed his own Residual Percentage at 100%, and the Residual Percentage of all other Members at 0%, Ader made the Ader Distribution of $28 million "pro rata to each Member in accordance with his, her or its Residual Percentage," granting 100% of the distribution to himself.

240.    Ader breached the Operating Agreement by distributing the Ader Distribution in accordance with a false and fraudulent allocation of the Member's Residual Percentage, rather than in accordance with a Residual Percentage calculation that "represent[ed] such Member's proportionate Capital Contribution."

241.    The Ader Distribution violated 6 Del. C. § 18-504, which provides that "Distributions of cash or other assets of a limited liability company shall be allocated among the members, and among classes or groups of members, in the manner provided in a limited liability company agreement."

242.    By virtue of the foregoing, Rimu is entitled to an award of damages against Ader in an amount to be determined at trial but reasonably believed to be at least $21.5 million, representing Rimu's actual Residual Percentage interest in the Ader Distribution, plus interest from the date of the Ader Distribution.

**EIGHTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**<u>(Against Ader as Manager of 26 Holdings)</u>**

243.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

244.    At all relevant times, Ader was and remains the Manager of 26 Holdings.

245.    As Manager of 26 Holdings, Ader had, and still has, fiduciary duties to the Members of 26 Holdings, including Rimu.

246.    As set forth above, Ader breached his fiduciary duties to Rimu by, among other things: (i) falsely and fraudulently setting Ader's Residual Percentage at 100%; (ii) falsely and fraudulently setting Rimu's Residual Percentage at 0%; (iii) making the Ader Distribution secretly and in violation of the terms of the Operating Agreement by making a distribution to himself only,

and not to Members in accordance with their actual Residual Percentages; and (iv) authorizing the Ader Distribution, which was undisclosed self-dealing.

247.    These were breaches of Ader's fiduciary duties owed to Rimu, and not to 26 Holdings itself, because: (i) Ader's false and fraudulent setting of the Rimu's Residual Percentage at 0% harmed Rimu, not 26 Holdings itself; (ii) making the Ader Distribution in violation of the terms of the Operating Agreement by making a distribution to himself only, and not to Members in accordance with their actual Residual Percentages deprived Rimu of its right to receive its proportionate share of the Ader Distribution, and did not harm 26 Holdings itself; and (iii) Ader's conduct as 26 Holdings' Manager was part of unified scheme by Ader to defraud Rimu.

248.    By virtue of the foregoing, Rimu is entitled to an award of damages against Ader in an amount to be determined at trial but reasonably believed to be $25 million plus interest.

## NINTH CAUSE OF ACTION
### Declaratory Judgment
### (Against Ader as Manager of 26 Holdings)

249.    Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

250.    As set forth above, under the Operating Agreement, Rimu's "'Residual Percentage' means the percentage interest attributable to a [Rimu's] residual interest in the Company …. representing [Rimu's] proportionate Capital Contribution."

251.    Ader, as Manager of 26 Holdings, falsely and fraudulently set Rimu's Residual Percentage at 0%.

252.    By reason of the foregoing, Rimu is entitled to a declaratory judgment that its Residual Percentage is, and shall be, recorded by 26 Capital at Rimu's proportionate capital contribution in accordance with the Operating Agreement.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants:

1.  ordering rescission of the Investment Management Agreement and Term Sheet;

2.  ordering rescission of the Rimu Transaction;

3.  awarding damages in an amount to be determined at trial, and reasonably believed to be in excess of $25 million, plus prejudgment and post-judgment interest to the fullest extent allowable by law;

4.  declaring that Rimu's Residual Percentage is, and shall be, recorded by 26 Capital at Rimu's proportionate capital contribution in accordance with the Operating Agreement;

5.  awarding costs and attorneys' fees to the fullest extent allowable by law; and

6.  granting such other relief as this Court deems just and proper.

Date: June 15, 2023

**LACHTMAN COHEN P.C.**

By: _____

Gregory A. Blue (GB9569)
245 Main Street, Suite 230
White Plains, NY 10601
Email: gblue@lcpclaw.com
Tel: (914) 505-6654
**Attorneys for Plaintiff**
